# *STATE v. PIKE.

Murder committed in perpetrating a robbery is murder of the first degree, al-
though not committed with a deliberate and premeditated design to kill.

Under an indictment, alleging that the accused " feloniously, wilfully and of
his malice aforethought, did kill and murder," the jury may return a verdict
of " guilty of murder in the first degree" upon proof of murder by deliberate
and premeditated killing. (Doe J., and Smith J., dissenting.)

Under such an indictment, the jury may return a verdict of " guilty of mur-
der in the first degree" upon proof of murder committed in perpetrating rob-
bery.

The order in which parties shall exercise the right of challenge, is a matter
within the discretion of the court at the trial term.

Whether a juror is "indifferent," and whether a confession was made in con-
sequence of inducements, are questions of fact, to be decided by the judge
presiding at the trial; and no exception lies to his finding.

An "impression" formed by one called as a juror, not strong enough to be
likely to prevent a candid judgment upon a full hearing of the evidence,
does not disqualify him to be sworn as a juror.

Any witness may testify, that a person was intoxicated, or under the influence
of intoxicating liquor.

The opinion of a witness, who is not an expert, as to the sanity of a respon-
dent, is incompetent, although formed from observation of the respondent's
appearance and conduct.    (Doe, J., dissenting.)

Whether there is such a disease as dipsomania, and whether a respondent had
that disease, and whether an act done by him was the product of such dis-
ease, are questions of fact for the jury.

The respondent requested the court to charge, that the respondent's sanity is a
fact to be proved by the state beyond all reasonable doubt; that there is no
legal presumption of sanity, which can have any weight with the jury as a
matter of law; and, that there is no legal presumption of sanity which is a
substitute for evidence, or which, as a matter of law, affects the burden of
proof in criminal cases.   The court declined so to instruct the jury; but
instructed them, "that every person of mature age is presumed to be sane,
until there is evidence tending to show insanity, but when there is evidence
coming from either side, tending to show insanity, then the state must
satisfy the jury beyond reasonable doubt that the prisoner is sane." Held,
that the respondent had no ground of exception.

INDICTMENT against Josiah L. Pike for murder, tried before Perley,

* This case was decided June term, 1869, and should have appeared in 48
N. H.   It was examined and re-affirmed in State v. Jones, Rockingham June
term, 1871.

                                                    REPORTER.

C. J., and Doe, J., October term, 1868. The defendant was found guilty of murder in the first degree, upon the following indictment:

"STATE OF NEW HAMPSHIRE,

ROCKINGHAM, SS.

At the supreme judicial court, holden at Portsmouth, within and for the county of Rockingham, aforesaid, on the third Tuesday of October, in the year of our Lord one thousand eight hundred and sixty-eight, the grand jurors for the state of New Hampshire upon their oath present that Josiah L. Pike, late of Newburyport, in the county of Essex and commonwealth of Massachusetts, yeoman, on the seventh day of May, in the year of our Lord one thousand eight hundred and sixty-eight, at Hampton Falls, in the county of Rockingham aforesaid, with force and arms, in and upon one Thomas Brown, feloniously, wilfully and of his malice aforethought, did make an assault—and that the said Josiah L. Pike, with a certain axe of the value of one dollar, which he, the said Josiah L. Pike, in both his hands, then and there, had and held, him, the said Thomas Brown, in and upon the left side of the head of him, the said Thomas Brown, then and there, feloniously, wilfully and of his malice aforethought, did strike and beat—giving to the said Thomas Brown then and there, with the axe aforesaid, and by the stroke aforesaid, in the manner aforesaid, in and upon the left side of the head of him, the said Thomas Brown, one mortal wound of the length of four inches and of the depth of one inch, of which said mortal wound, the said Thomas Brown, from the said seventh day of May aforesaid, in the year aforesaid, until the thirteenth day of the same month of May, in the year aforesaid, at Hampton Falls aforesaid, did languish, and languishing did live—on which said thirteenth day of May aforesaid, in the year aforesaid, the said Thomas Brown, at Hampton Falls aforesaid, in the said county of Rockingham, of the wound aforesaid died.

"And so the jurors aforesaid, upon their oath aforesaid, do say that the said Josiah L. Pike, him, the said Thomas Brown, on the said seventh day of May aforesaid, in the year aforesaid, at Hampton Falls aforesaid, in the said county of Rockingham, in manner and form aforesaid, feloniously, wilfully and of his malice aforethought, did kill and murder. Contrary to the form of the statute in such case made and provided, and against the peace and dignity of the state."

The Chief justice instructed the jury that if the defendant murdered said Brown by deliberate and premeditated killing, or in perpetrating or attempting to perpetrate robbery, the verdict should be guilty of murder in the first degree; to which instructions defendant excepted. A jury was obtained without calling all the jurors in attendance. The defendant peremptorily challenged sixteen. The defendant excepted to the ruling of the court allowing the state to set aside one juror without assigning cause, after he had been examined on oath by counsel on both sides, and defendant's counsel had stated

that they did not object to his being sworn as a juror.  It was within the knowledge of the court that this juror was a relation of one of the defendant's counsel.   J. F. Tenney, drawn as juror, testified as follows :  "I read the reports in the newspaper and from them derived the impression that the defendant was guilty.  Taking those reports to be true I should think the defendant guilty ; but I pay little attention to such reports ; notwithstanding what I read in the newspaper, and the impression I received from the reading of it, I think I could try the defendant on the evidence without prejudice ; I think I have no opinion or impression which would prevent me from trying him impartially on the evidence."

Upon this testimony the court found as matter of fact that said Tenney was indifferent, and he was sworn as a juror, and defendant excepted.

One Leavitt, keeper of the jail to which defendant was committed by a magistrate, testified as follows : "I've no recollection that I told him it would be better for him if there was an accomplice found ; he may have inferred that it would be better for him if an accomplice were found.   I possibly may have told him so, but I have no recollection of it.   I did not at any time hold out any inducement to him to make a confession.   At the time he made the statement and before he made it, I told him I might be obliged to testify to it, and it might go against him."

Upon this testimony the court ruled that a confession made by defendant to Leavitt was not made in consequence of inducement held out by Leavitt, and Leavitt was allowed to testify to such confession and defendant excepted.

Witnesses, not experts, were allowed to testify for the state, that, at different times, defendant was, and was not, intoxicated ; and did, and did not, appear to be under the influence of intoxicating liquor, and defendant excepted.   Witnesses, not experts, called by the defendant were not allowed to testify that from their observations of his appearance and conduct before the alleged murder, they formed the opinion that he was insane, and defendant excepted.

A witness called by defendant, testified that a few days before the alleged murder, the defendant came to the witness' shop in Newburyport, and said and did various things there, and that the witness shut up his shop and started to go away.   The defendant offered to prove by this witness that the reason of his shutting up his shop and starting to go away, was that he was afraid of defendant on account of his excited and wild appearance and conduct on that occasion.   The court excluded the evidence and defendant excepted.   Another witness called by defendant testified to the appearance and conduct of defendant at another time when they retired to the same bed in the evening, and that witness rose after defendant went to sleep, and went to sleep in another bed.   The defendant offered to prove by this witness that the reason of his going to another bed was that he was afraid of defendant on account of his excited and wild appearance and conduct on that occasion.   The court excluded the evidence and defendant excepted.

The defendant's counsel claimed that the defenda nt was irresponsible by reason of a species of insanity called dipscmania. The court instructed the jury, as requested by the defendant, that, if they found that the defendant killed Brown in a manner that would be criminal and unlawful if the defendant were sane—the verdict should be " not guilty by reason of insanity " if the killing was the offspring or product of mental disease in the defendant ; that neither delusion nor knowledge of right and wrong, nor design or cunning in planning and executing the killing and escaping or avoiding detection, nor ability to recognize acquaintances, or to labor or transact business or manage affairs, is, as a matter of law, a test of mental disease ; but that all symptoms and all tests of mental disease are purely matters of fact to be determined by the jury."*

The court also instructed the jury that whether there is such a mental disease as dipsomania, and whether defendant had that disease, and whether the killing of Brown was the product of such disease, were questions of fact for the jury, to which instruction the defendant excepted.

The defendant requested the court to instruct the jury that the sanity—the mental capacity of the defendant to commit any crime charged in the indictment—is a fact to be proved by the state beyond all reasonable doubt ; that there is no legal presumption of sanity, which can have any weight with the jury as a matter of law ; that there is no legal presumption of sanity which is a substitute for evidence, or which, as a matter of law, affects the burden of proof in criminal cases. The court declined so to instruct the jury and defendant excepted.

The court instructed the jury that every person of mature age is presumed to be sane, until there is evidence tending to show insanity ; but when there is evidence coming from either side tending to show insanity, then the state must satisfy the jury beyond reasonable doubt that the prisoner is sane ; to which instructions the defendant excepted.

The defendant moved to set aside the verdict, the court overruled the motion, and the defendant filed this bill of exceptions, which was allowed and signed by the court.

*Goodall and Frink*, for respondent.

*Attorney General and Solicitor*, for state.

SMITH, J.   " All murder committed by poison, starving, torture, or other deliberate and premeditated killing, or committed in perpetrating or attempting to perpetrate,·arson, rape, robbery or burg-

---

* These instructions were held correct in *State* v. *Jones*. See note, *ante* page 399.

REPORTER.

lary, is murder of the first degree; and all murder not of the first degree is of the second degree." Gen. Stat. ch. 264, sec. 1.

"If the jury shall find any person guilty of murder, they shall, by their verdict, find also whether it is of the first or second degree." Gen. Stat. ch. 264, sec. 2.

"If any person shall plead guilty to an indictment for murder, the court having cognizance of the offence shall determine the de-' gree." Gen. Stat. ch. 264, sec. 3.

"In indictments for causing the death of any person, it is not ne-cessary to set forth the manner in which or the means by which the death of the deceased was caused; but it is sufficient, in every in-dictment for murder to charge that the defendant did feloniously-wilfully, and of his malice aforethought, kill and murder the deceas-ed, and in every indictment for manslaughter to charge that the de-fendant did feloniously kill and slay the deceased." Gen. Stat. ch. 242, sec. 14.

I. The respondent takes the position that murder committed in perpetrating a robbery is not murder of the first degree unless com-mitted with a deliberate and premeditated design to kill.

This is untenable. The term "murder" in sec. 1, ch'. 264, Gen. Stat., is intended to include all kinds of unlawful killing which were mur-der at common law, or in other words "the several offences which are included under the general denomination of murder," at common law. At common law the killing of a man while the slayer was en-gaged in perpetrating a robbery was murder.

The legislature did not intend that this species of killing should be murder of the first degree only when accompanied by a deliberate, premeditated, design to kill; for if such a design had been a neces-sary ingredient to constitute murder of the first degree, the latter part of section first would not have been added.

If killing in the perpetration of a robbery, was murder of the first degree only when accompanied with such a design, it was already included under the words "other deliberate and premeditated kill-ing," and nothing further need have been said about it.

Section first as construed by respondent would read substantially thus: "All murder committed by deliberate and premeditated kill-ing, or committed by deliberate and premeditated killing in perpe-trating robbery, is murder of the first degree." We think the mean-ing of the section better expressed by the following reading: "All kinds of unlawful killing which constituted murder at common law, if committed by poison, starving, torture, or other deliberate and pre-meditated killing, or if committed in perpetrating or attempting to perpetrate arson, rape, robbery or burglary, constitute under this statute, murder of the first degree; and all other kinds of unlawful killing which constituted murder at common law, constitute under this statute, murder of the second degree."

II. Did the indictment charge murder by deliberate and premedi-tated killing, or in perpetrating robbery? If not, the instructions to the jury were erroneous.

The indictment is in the form prescribed by statute (Gen. Stat. ch. 242, sec. 14). This is the common law form, and probably the only one used in this state, either before, or since, the statute dividing murder into two degrees. We presume that several persons have been executed in this state, who were convicted of murder in the first degree under a similar indictment and upon similar instructions.

But, notwithstanding these facts, a plausible argument may be made in support of the position, that this indictment does not charge murder by deliberate and premeditated killing, and that, therefore, proof of such killing will not justify a verdict of murder in the first degree under this indictment.

Prior to the statute of 23, Henry 8th, all felonious homicides were of one sort. That statute made a destinction between homicides committed wilfully, "of malice prepensed," and those not so committed. The former are now designated by the term, "murder," the latter by "manslaughter." The practice has been in charging manslaughter to allege the act to have been done "feloniously," or "wilfully and feloniously;" in charging murder to allege it to have been done "feloniously, wilfully, and of his malice aforethought." The words "malice aforethought," long ago acquired in law a settled, meaning somewhat different from their popular signiffication. In their legal sense, these words do not import an actual intention to kill the deceased. "Malice, although in its popular sense, it means hatred, illwill, or hostility to another, yet, in its legal sense, has a very different meaning," perhaps well expressed by the words—"a wrong motive of any kind;" it signifies "the wilful doing of an injurious act, without lawful excuse." So "malice aforethought" "is not so properly spite or malevolence to the deceased in particular, as any evil design in general; the dictate of a wicked depraved and malignant heart; *un disposition a faire un male chose;* and it may be either *express* or *implied* in law," 4 Blackstone Com. 198. It "does not mean premeditated personal hatred or revenge against the person killed; but it means that kind of unlawful purpose, which, if persevered in, must produce mischief, such as if accompained with those circumstances that show the heart to be perversely wicked, is adjudged to be proof of malice prepense." Lord Denman, C. J. in *Regina* v. *Tyler,* 8 Car. & Payne, 616.

Within a comparatively recent period statutes have been enacted in this and other jurisdictions, similar to the statute now in force here, classifying certain kinds of murder under the head of "murder of the first degree," "and all other kinds under murder of the second degree;" there being a wide difference in the punishments provided by the statute for the two degrees.

The words "deliberate and premeditated killing" used in the statute obviously mean something more than the expression "malice aforethought" construed in its legal signification; they import an intent to take the life of the deceased.

Since the passage of this statute, can a respondent, indicted for murder "with malice aforethought," be convicted of murder in the first degree upon proof of "deliberate and premeditated killing?"

On the one hand it is urged that the stream cannot rise higher than its fountain, the verdict cannot go beyond the indictment; that, as in an action of debt the plaintiff shall not recover more than the demand laid in the declaration, nor have judgment even for that demand unless his declaration alleges such facts and circumstances as show him entitled to it, so in criminal cases the state cannot ask the jury to find the respondent guilty of an offence with which he has not been charged; that every circumstance which affects the punishment as provided by law must be alleged in the indictment; that, when a statute prescribes a punishment for larceny of property of the value of twenty dollars, more severe than that prescribed for larceny of property under that value, (see Gen. Stat. ch. 260, sects. 3–5,) the jury cannot upon the trial of an indictment alleging larceny of property of the value of fifteen dollars find the respondent guilty of stealing property of the value of twenty-five dollars, or, if they do, the court can only inflict the sentence prescribed for stealing less than twenty-dollars in value; that although formerly the premeditation did not affect the punishment, and therefore need not have been alleged, yet, if it *now* affects it, the indictment must allege it, else the jury cannot find it; that whether the two degrees of murder are, technically speaking, distinct and different crimes or not, yet practically there is a wider gulf between them, so far as the punishment is concerned, than between any other two kindred offences known to the law, the difference being that between life and death.

On the other hand it is urged that the statute creates no new offence; that murder of the first and murder of the second degree are not two distinct crimes, the statute merely dividing murder into two degrees; that the punishment for the higher grade of the crime is not changed; that all which the statute does is to provide the milder punishment of imprisonment for murder of the second degree, *all* murder having before been punishable by death; that the statute only specifies certain things, which, if found by the jury, shall require them to bring in a verdict subjecting the prisoner to death; while, if they are not so found, the verdict shall be one authorizing imprisonment merely.

The numerical weight of authority is decidedly in favor of the latter view. It is sustained by decisions in Maine (*State* v. *Verrill*, 54 Maine 408;) in Pennsylvania (*Com* v. *Flanagan*, 7 W. & S. 415;) in Massachusetts, (*Green* v. *Com.*, 12 Allen 155;) in Texas *Gehrke* v. *State*, 13 Texas 568;) in Virginia (1 Va. Cases 310, 2 Va. Cases 387, 14 Grattan 592,) and in California (*People* v. *Murray*, 10 Calif. 309;) also, by decisions of a majority of the court in New York (*Fitzgerald* v. *People*, 37 N. Y. 413, 685,) and in Tennessee (*Mitchell* v. *State*, 8 Yerger 514;) and the same doctrine is re-affirmed in New York in *Kennedy* v. *The People*, 39 N. Y. 245.

On the opposite side are the decision in *State* v. *Jones*, 20 Missouri 58, (based in great degree upon the practice in that state;) and the decision in *Fonts* v. *State*, 4, (G. Greene) Iowa 500; which has been seriously questioned, if not overruled, in the subsequent case of

*State* v. *Johnson*, 8 Iowa 525. There are also the dissenting opinions of Peck, J., 8 Yerger, p. 534; and Bacon J., 37 N. Y. p. 685.

Wharton, in his American Criminal Law, and in his work on homicide, lays down the rule contended for by the state, but without any discussion: See 1 Wharton Am. Crim. Law, sec. 1115.

Bishop, in his work on Criminal Procedure, discusses the question elaborately, and argues strongly in favor of the opposite view. 2 Bishop on Criminal Procedure, 1st Ed., sec's 562–597: Bishop's First Book of the Law, sec. 401.

It may be questionable whether section 14 of chap. 242, Gen. Stat., prescribing the form of indictment for murder, can avail the state on this point. That statute does not provide that the words "malice aforethought," when used in indictments for murder, shall be construed according to their popular meaning. In the absence of such a proviso, these words, having acquired a definite meaning at common law, must be understood as having this common law meaning affixed to them when used in the statute, although such legal meaning may differ from their literal sense, or from their meaning when used in common conversation; See *Mayo* v. *Wilson*, 1 N. H. 53, p. 55; *Thurber* v. *Blackbourne*, 1 N. H. 242, p. 245.

If, then, these words do not, in their legal meaning, imply a deliberate and premeditated design to kill, can they be construed as sufficiently charging such a design, merely because the legislature has authorized their use in their legal meaning?

And, if they do not charge that offence, can the legislature authorize a conviction for that offence under this form of indictment? The accused has a constitutional right to have the offence plainly and substantially described in the indictment: See 1 Bishop on Criminal Procedure, 1st Ed., sec's 403–406.

A majority of the court think, that, under this indictment, the respondent can be convicted of murder in the first degree upon proof that he murdered Brown by deliberate and premeditated killing; I am unable to assent to this view; and I am authorized to say that Judge Doe does not concur in the opinion of the majority on this point.

Under this indictment, the respondent can be convicted of murder in the first degree upon proof of murder committed in the perpetration of a robbery. The words "malice aforethought," in their legal sense, well describe the motive necessary to be proved in such a case, which, as we have just held, does not involve the idea of a deliberate and premeditated design to kill the deceased.

III. The constitutionality of the statute allowing the state two peremptory challenges has just been affirmed in *State* v. *Wilson*, 48 N. H. 398; see also, *Com.* v. *Dorsey*, 103 Mass. 412.

The order in which the parties shall exercise the right of challenge is within the discretion of the court at the trial term, and their ruling on this point is not matter for exception: See Doe, J. in *Boardman* v. *Woodman*, 47 N. H. 120, p. 144.

IV. The question whether Tenney was "indifferent" was one of

fact to be decided by the court at the trial : See *Rollins* v. *Ames*, 2
N. H. 350 ; *State* v. *Howard*, 17 N. H. 171, p. 191–2 ; *March* v.
*Portsmouth & Concord Railroad*, 19 N. H. 372 ; the court are "the,
triers" of this question ; and their decision stands like the verdict of
a jury, to be reversed only when it is manifestly against law and evi-
dence.    Such ground for reversal does not exist in this case.    The
decision seems correct.    Without attempting to review or reconcile
the numerous cases on this topic (see 1 Bishop Crim. Procedure,
sec. 771, note ; 2 Wharton Am. Crim. Law, sec. 2976–3016) it is
sufficient to say that we adopt the views expressed by Shaw, C. J.
in *Com.* v. *Webster*, 5 Cush. 295, p. 297–8.——"The statute intend-
ed to exclude any person who had made up his mind, or formed a
judgment in advance, in favor of either side.    Yet, the opinion or
judgment must be something more than a vague impression, formed
from casual conversation with others, or from reading imperfect, ab-
breviated newspaper reports.*    It must be such an opinion upon the
merits of the question, as would be likely to bias or prevent a can-
did judgment, upon a full hearing of the evidence.    If one had
formed what in some sense might have been called an opinion, but
which yet fell far short of exciting any bias or prejudice, he might
conscientiously discharge his duty as a juror :" See also, Parker, C.
J. in *State* v. *Howard*, 17 N. H. 171, p. 194, 5.

V.    Whether the confession by the respondent to Leavitt was made
in consequence of inducement held out by Leavitt, was a question of
fact to be decided by the judges who presided at the trial ; and their
finding upon this question is a finality as much as the verdict of a
jury upon a question of fact.    See *State* v. *Squires*, 48 N. H.
364.    The respondent has, therefore, no ground of exception to the
admission of the confession.

VI.    The evidence as to intoxication was not objectionable.    *People*
v. *Eastwood*, 14 N. Y. 562, and *Gahagan* v. *Boston & Lowell R. R.
Co.*, 1 Allen 187, directly sustain the ruling : see, also, *Whittier* v.
*Franklin*, 46 N. H. 23, and cases there cited ; *State* v. *Shinborn*, 46
N. H. 497.    Intoxication is a fact open to the observation of every
man ; and no " special skill or learning " is requisite to discern it.

VII.    A majority of the court are not disposed to overrule the
very recent decision, in *Boardman* v. *Woodman*, 47 N. H. 120, that
witnesses who are not experts cannot give their opinions on the
question of sanity.

Under this view of the law, the reasons which induced witnesses
to leave the respondent were properly excluded.    Probably the
practical result of a contrary ruling would be to allow the witnesses
to give their opinions on sanity.    They were allowed to describe the
respondent's appearance, and his and their conduct.    It was for the
jury to say what inferences should be drawn from the facts described.
A similar exception was overruled in *Boardman* v. *Woodman*, 47 N. H.
120 ; see p. 121.

VIII.    The court instructed the jury " that whether there is such
a mental disease as dipsomania, and whether defendant had that

disease, and whether the killing of Brown was the product of such disease, were questions of fact for the jury."

This was correct. If there are any diseases whose existence is so much a matter of history and general knowledge that the court may properly assume it in charging a jury, dipsomania certainly does not fall within that class. The court do not profess to have the qualifications of medical experts. Whether there is such a disease as dipsomania is a question of science and fact, not of law.

IX. Whether the presumption of sanity is one of law or fact, (a point on which contradictory views have been expressed in recent cases in this state; see Bell, C. J., in *Perkins* v. *Perkins*, 39 N. H. 163, p. 170, 171; Bellows, J., in *State* v. *Bartlett*, 43 N. H. 224, p. 230; instructions to jury by Bartlett, J., in *Boardman* v. *Woodman*, 47 N. H. 120, p. 123,) or a mixed presumption of law and fact (see *Sutton* v. *Sadler*, 3 Com. Bench, N. S. 87), is in many cases "a question merely verbal; a question of the propriety of certain forms of expression."

If it be merely a presumption of fact, it is, nevertheless, a presumption drawn from the common experience of mankind, which the court were well warranted in calling the attention of the jury to; and it is a presumption which the jury would inevitably have made whether the court had referred to it or not. For these reasons we think the refusal to charge, "that there is no legal presumption which can have any weight with the jury as matter of law," could not have materially prejudiced the respondent.

The court also declined to instruct the jury "that there is no legal presumption of sanity which is a substitute for evidence."

We think that the presumption of sanity, whether it be a presumption of law or of fact, is, in one sense, "a substitute for evidence." "The general presumption of sanity is sufficient *prima-facie* evidence of that fact" to warrant a finding of sanity where no evidence is introduced tending to show insanity.

The other instructions requested on this point (see *State* v. *Bartlett*, 43 N. H. 224) were substantially included in the instructions given.

*Exceptions overruled.*

DOE, J. I. Witnesses, not experts, called by the defendant, were not allowed to testify that from their observations of his appearance and conduct before the alleged murder, they formed the opinion that he was insane. This testimony should have been received.

In England no express decision of the point can be found for the reason that such evidence has always been admitted without objection. It has been universally regarded as so clearly competent that it seems no English lawyer has ever presented to any court, any objection, question or doubt in regard to it. But in *Wright* v. *Tatham*, 5 Cl. & Fin. 670, S. C. 4 Bing. N. C. 489, the question was involved in such a manner, and the number and strength of the judi-

cial opinions were such, as to make that case an authority of the greatest weight in favor of the competency of the evidence.

In addition to that case and the other English authorities cited in *Boardman* v. *Woodman*, 47 N. H. 144, are *Lowe* v. *Jolliffe*, 1 W. Bl. 365; *Attorney-General* v. *Parnther*, 3 Br. C. C. 441, 442; *King* v. *Arnold*, 16 St. Tr. 695, 706, 707, 708, 710, 711, 712, 713, 715, 717, 719, 723, 724, 725, 726, 727, 728, 730, 752, 735, 736, 737, 738, 739, 742, 746, 747, 748, 750, 751, 753, 754, 755, 756, 757, 758, 759, 760, 761, 762, 763; *King* v. *Ferrers*, 19 St. Tr. 885, 923, 924, 925, 926, 927, 928, 929, 930, 931, 932, 933, 937, 938, 939, 940, 941, 952, 953; *King* v. *Frith*, 22 St. Tr. 307, 313, 314, 315, 317; *King* v. *Hadfield*, 27 St. Tr. 1281, 1299, 1301, 1304, 1305, 1330, 1331, 1332, 1337, 1347, 1350, 1453; *King* v. *Bellingham*, Annual Register 1812, part 2, pp. 304, 307; *King* v. *Bowler*, Ann. Reg. 1812, part 2, pp. 309, 310; *King* v. *Offord*, Ann. Reg. 1831, part 2, pp. 107, 108; *Queen* v. *Oxford*, 9 C. & P. 525, 317, 318; S. C. in Ann. Reg. 1840, part 2, pp. 249, 257, 259; S. C. in 1 Townsend Modern State Trials, 102, 125, 132, 133, 134, 135; *Queen* v. *Higginson*, 1 C. & K. 129, 130; *Queen* v. *M'Naughten*, Ann. Reg. 1843, part 2, pp. 345, 353, 354, 355, 356, 357; S. C. in 1 Townsend Mod. St. Tr. 344, 347, 348, 349, 384, 385, 387, 388, 389, 390, 391, 392; *Queen* v. *Dove*, J. F. Stephen Cr. Law, 391, 394, 395, 396; *Queen* v. *Mitchell*, Ann. Reg. 1863, part 2 pp. 157, 159; *Queen* v. *Townley*, Ann. Reg. 1863, part 2, pp. 296, 302, 304; *Queen* v. *Baker*, Ann. Reg. 1867, part 2, pp. 217, 224.

The number of English authorities is limited only by the number of fully reported cases in which the question of sanity has been raised.

The uniform rule in England, from the earliest times to the present, may be wrong; but on a common-law subject like this, it is entitled to consideration. It should be set aside, and a new rule should be established if it can be clearly shown that all the authorities of the native land of the common law have been erroneous from the beginning, and in conflict with the principles of the common law, or that they are not applicable to our institutions or the circumstances of this country. But whoever asserts that such a condition exists, has the task of maintaining the assertion; and that task on this question has never been performed.

In this country the authorities are almost equally unanimous in favor of the competency of the evidence. *Lester* v. *Pittsford*, 7 Vt. 158; *Morse* v. *Crawford*, 17 Vt. 499: *Clifford* v. *Richardson*, 18 Vt. 620, 627; *Cram* v. *Cram*, 33 Vt. 15; *Crane* v. *Northfield*, 33 Vt. 124; *Cavendish* v. *Troy*, 41 Vt. 99, 108; *Grant* v. *Thompson*, 4 Conn. 203; *Kinne* v. *Kinne*, 9 Conn. 102; *Dunham's Appeal* 27 Conn. 192; Swift's Ev. 111; *Stewart* v. *Lispenard*, 26 Wend. 291, 308, 309, ; *Culver* v. *Haslam*, 7 Barb. 314; *De Witt* v. *Barley*, 13 Barb. 550; S. C. 9 N. Y. 371; S. C. 17 N. Y. 340; *Delafield* v. *Parish*, 25 N. Y. 37, 38; *Clapp* v. *Fullerton*, 34 N. Y. 190; *Clark* v. *Sawyer*, 3 Sandf. Ch. 357; *Den* v. *Gibbons*, 2 Zab. 117, 135,

136; *Whitenack* v. *Stryker*, 1 Green Ch. 8; *Sloan* v. *Maxwell*, 2 Green Ch. 563, 583, 584, 586, 588, 592, 594, 599, 602; *In the matter of Vanauken*, 2 Stock. Ch. 192; *Turner* v. *Cheesman*, 15 N. J. Ch. 243; *Garrison* v. *Garrison*, Id 266; *Rambler* v. *Tyron*, 7 S. & R. 90, 92; *Irish* v. *Smith*, 8 S. & R. 573, 576; *Wogan* v. *Small*, 11 S. & R. 141, 144; *Grabill* v. *Barr*, 5 Penn. St. 441, 443; *Wilkinson* v. *Pearson*, 23 Penn. St. 117, 120; *Bricker* v. *Lightner*, 40 Penn. St. 199; *Duffield* v. *Morris*, 2 Harring. (Del.) 375, 377, 385; *Brooke* v. *Townsend*, 7 Gill 1028; *Stewart* v. *Redditt*, 3 Md. 67, 78; *Stewart* v. *Spedden*, 5 Md. 433, 446; *Dorsey* v. *Warfield*, 7 Md. 65, 73; *Weems* v. *Weems*, 19 Md. 334, 345; *Temple* v. *Taylor*, 1 Hen. & Munf. 476, 478; *Burton* v. *Scott*, 3 Rand. 399, 403, 404, 405; *Mercer* v. *Kelso*, 4 Grat. 106, 118; *Clary* v. *Clary*, 2 Ired. 78; *Heyward* v. *Hazard*, 1 Bay 335, 340, 341, 342, 343, 344; *Griffin* v. *Griffin*, R. M. Charlt. 217, 218, 220, 221, 223; *Potts* v. *House*, 6 Ga. 324; *Berry* v. *State*, 10 Ga. 510, 529; *Walker* v. *Walker*, 14 Ga. 242, 251; *Roberts* v. *Trawick*, 13 Ala. 68, 84; *Norris* v. *State*, 16 Ala. 776; *Florey* v. *Florey*, 24 Ala. 241, 247; *Powell* v. *State*, 25 Ala. 21; *Stubbs* v. *Houston*, 33 Ala. 355, 564; *In re Carmichael* 36 Ala. 514, 522; *Gibson* v. *Gibson*, 9 Yerg. 329; *Baldwin* v. *State*, 12 Mo. 223; *Farrell* v. *Brennan*, 32 Mo. 328; *Kelly* v. *McGuire* 15 Ark. 555, 601; *Abraham* v. *Wilkins*, 17 Ark. 292, 322; *State* v. *Gardner*, Wright 392, 398; *Clark* v. *State*, 12 Ohio 483, 490; *Doe* v. *Reagan*, 5 Blackf. 217; *Roe* v. *Taylor*, 45 Ill. 485; *Pelamourges* v. *Clark*, 9 Iowa 1, 11–19, 29; *State* v. *Felter*, 25 Iowa 67; *White* v. *Bailey*, 10 Mich. 155, 161; *Beaubien* v. *Cicotte*, 12 Mich. 459, 495–508; Case of *Lawrence* tried in the Dist. of Columbia, before Judge Cranch and two other judges, for shooting at President Jackson, 48 Niles Reg. 119; *Hoge* v. Fisher, Pet. C. C. 163, 165; *Harrison* v. *Rowan*, 3 Wash. C. C. 580, 582, 586.

On the other side there are authorities in Maine, Massachusetts and Texas, which hold a contrary doctrine; but, on examination, they are found to occupy very feeble positions.

So far as the history of the law, on this subject, has been brought to the notice of this court, the first time the competency of this evidence was doubted, was in the jury trial of a probate case at Cambridge, Mass., in 1807. The only account we have of that affair, is the report of Mr. Tyng, who says, that the court permitted the subscribing witnesses to the will to give their opinions of the sanity of the testator, and that, " other witnesses were allowed to testify to the appearance of the testator, and to any particular facts from which the state of his mind might be inferred, but not to testify merely their opinion or judgment." *Poole* v. *Richardson*, 3 Mass. 330. From the conspicuous and emphatic use of the word " merely," and from what occurred in subsequent Massachusetts cases, there is reason to suspect that the only point ruled in this case, was, that the witnesses were allowed to give their opinions when they stated the particular facts from which the state of the testator's mind was in-

ferred by them, " but not to testify merely their opinion or judgment." They " were allowed to testify to the appearance of the testator ;" and they could not do that without giving their opinions. It was a ruling made hastily and probably instantaneously, without argument, during a trial before a jury, at a time when the hurry of clearing the crowded dockets of Massachusetts, gave no opportunity for deliberation.

If the court had been aware that this ruling overturned all the authorities and the uniform practice of England and America from the begining of the common law to that day, it is not to be presumed that the ruling would have been made without a formal opinion reduced to writing by some member of the court, formally delivered, and formally reported, giving some reason for the innovation. If they had been conscious of the novel and revolutionary character of the precedent, they would not have introduced it so summarily and inconsiderately.

This was not the only mistake made at Nisi Prius. In the previous month, in the trial of another probate case, when the only issue was upon the sanity of a testator, and the formal execution of the will was therefore not in question, the court refused to allow two of the subscribing witnesses of the will to testify because the third witness was not produced. *Chase* v. *Lincoln,* 3 Mass. 236. Nor are these the only peculiarities in the precedents of that state. At the trial of another probate case, the physicians who attended the testatrix in her last sickness, were asked whether in their opinion she was sane. Objection was made to the competency of any opinion. The court ruled that the attending physicians might give their opinions but must state the particular circumstances or symptoms from which they drew their conclusions. *Hathorn* v. *King,* 8 Mass. 371. And in *Dickinson* v. *Barber,* 9 Mass. 225, it was held on that ground, that certain depositions of physicians had been rightly excluded. In *Com.* v. *Rich,* 14 Gray, 335, 337, it was held as matter of law, that a physician of thirty years practice, who testified that he had made the subject of mental disease a study but not a special study, and had had the usual experience of practicing physicians on the subject, could not be questioned upon a hypothetical case stated in the usual manner. These cases show a peculiar and exceptional system of practice on these subjects, which has never prevailed in this state.

In *Buckminster* v. *Perry,* 4 Mass. 593; " two or three witnesses were of opinion that the testator was much broken and very forgetful about the time the will was made." Instead of rejecting this evidence, the court charged the jury " that the evidence given by the appellants to invalidate the will, deserved but little consideration." In *Needham* v. *Ide,* 5 Pick. 510, the jury were instructed that the " *mere opinions* of other witnesses" than those who subscribed the will, "were not competent evidence, and were not entitled to *any weight,* further than they were supported by the facts and circumstances proved on the trial." These witnesses gave their opinions, "without being asked" ; objection was not made to their opinions ; their opinions were

not rejected at the time they were given, nor absolutely excluded from the consideration of the jury by the charge of the court. But in Com. v. *Wilson*, 1 Gray 337, 339 at *nisi prius*, in.*Hubbell* v. *Bissell*, 2 Allen 196, 200 by a *dictum*, and in *Com.* v. *Fairbanks*, 2 Allen 511 in a *per curiam* decision, it was held that the incompetency of the opinions of non-experts, was not an open question in Massachusetts. The court merely refused to investigate the question. In this abrupt and unsatisfactory manner, without any consideration from first to last, has this exception become established in that state. Of the four judges reported as present at the October term, 1807, at Cambridge, we do not know who were present at the trial of *Poole* v. *Richardson*. The next year, at Cambridge, when Ch. J. Parsons charged the jury in *Buckminster* v. *Perry*, witnesses were allowed to testify that in their opinion " the testator was much broken and very forgetful"; and this evidence was not excluded from the consideration of the jury. In *Needham* v. *Ide*, no opinion of the court is reported; but the reporter says that the court overruled an objection taken to the instruction given to the jury that the mere opinions " were not entitled to any weight further than they were supported by the facts and circumstances proved on the trial." After that, at *nisi prius*, and in a *dictum*, and in a *per curiam* decision, the court held themselves concluded by their own precedents.

The only judge in Massachusetts who appears to have deliberated on the subject, gave his judgment against the peculiar practice of that state. In *Baxter* v. *Abbott*, 7 Gray, 71, 79, Judge Thomas says, " All lawyers know how difficult it is to try issues of sanity with the restrictions as to matters of opinion already existing; how hard it is to make witnesses distinguish between matters of fact and opinion on this subject; between the conduct and traits of character they observe, and the impression which that conduct and those traits create, or the mental conclusion to which they lead the mind of the observer. If it were a new question I should be disposed to allow every witness to give his opinion subject to cross-examination, upon the reasons upon which it is based, his degree of intelligence and his means of observation."

The counties of Massachusetts, which became the state of Maine thirteen years after the exception was introduced in *Poole* v. *Richardson*, did not abandon their practice on that point, as they did not abandon the general system of practice which had grown up with them while they were a part of Massachusetts. For thirteen years the exception had the same authority, and was administered by the same cour, in Ess ex and in York. As it was never examined in Massachusetts on the south, so it has never been examined in Massachusetts on the east. *Ware* v. *Ware*, 8 Greenl. 42, 54, 55, 56; *Wyman* v. *Gould*, 47 Me. 159. It is equally regarded in both as an inherited peculiarity for which no one is responsible. Its position as an authority, was not materially strengthened by the division of the state.

In *Gehrke* v. *State*, 13 Texas 568, it was summarily held, without

any citation of authority, or consideration of principle, that it would have been improper to receive as evidence the vague, indefinite expression of a witness, that the prisoner looked like, or acted as, an insane person.

Thus stand the precedents of other jurisdictions at present, so far as they have been brought to the notice of this court; Massachusetts, Maine, and Texas on one side; the rest on the other; and no attempt in either of the three states, to justify their peculiar exception. If this amounts to a conflict among the authorities, it must be regarded as inconsiderable.

In many of the cases in which the opinions of ordinary witnesses, have been received, the question has been fully considered, and their competency established on solid ground. "Testimony of opinion may be given where, from the general and indefinite nature of the enquiry, it is not susceptible of direct proof. Thus upon a question of insanity witnesses, not professional men, may be permitted to give their opinion in connection with the facts observed by them. But this evidence is always confined to those who have observed the facts, and is never permitted where the opinion of the witness is derived from the representation of others. Upon a question of insanity, for instance, witnesses who have observed the conduct of the patient, and been acquainted with his conversation, may testify to his acts and sayings, and give the result of their observation; but where mere opinion is required upon a given state of facts, that opinion is to be derived from professional men." *Lester* v. *Pittsfovd*, 7 Vt. 158, 161. "The law is well settled and especially in this state, that a witness may give his opinion in evidence, in connection with the facts upon which it is founded, and as derived from them, though he could not be allowed to give his opinion founded upon facts proved by other witnesses." *Morse* v. *Crawford*, 17 Vt. 499, 502. "Where mere opinion is required upon a given state of facts not connected with the personal observation of the witness, that opinion is to be received from professional men alone." *Cram* v. *Cram*, 33 Vt. 15, 18. · These extracts are a sufficient answer to the objection made against some of the authorities that they require the witness to state facts as well as opinion. The objection is as invalid as it would be if made against the admission of opinions as to physical health. A witness cannot testify that in his opinion the defendant was sick, or well, without first showing that he had an opportunity of forming an opinion from facts observed by himself. If a witness, not an expert, is first asked whether, in his opinion, A. was sane or insane at a certain time, the witness would not be allowed to answer the question. It must first appear that his opinion is formed upon his own observations and not upon the testimony of other witnesses, or upon hearsay, or upon a hypothetical case. If his opinion is formed upon the testimony of other witnesses, the jury have as good an opportunity as the witness to form an opinion; if it is formed upon hearsay, it is mere indirect proof of hearsay; of a hypothetical case, the jury can form an opinion as well as a non-

.expert witness. But if the opinion of the witness is formed upon his own observations, he had a better opportunity to form an opinion than the jury can have from a description of the acts and words of the person whose sanity is in question; because such a description cannot generally convey any adequate idea of the signs of sanity or insanity as they appear to an observer. It is necessary as far as possible that the impression produced by the acts and words, should be conveyed to the jury, and it cannot generally be conveyed by a mere description .or recital of them; therefore the opinions of ob-servers constitute one of the classes of testimony known in law as the best evidence; not the best because it happens to be the only available evidence in a particular case; but the best because it be-longs to one of the best species of evidence usually available,—the best in the nature of things,—the best by reason of "the general and indefinite nature of the inquiry, and the difficulty of producing direct proof of a mere mental condition." *Crane* v. *Northfield*, 33 Vt. 124, 125. "The best testimony the nature of the case admits of, ought to be adduced; and on the subject of insanity, in my judg-ment, it consists in the representation of facts, and of the impress-ions which they made." *Grant* v. *Thompson*, 4 Conn. 203.

"The judgment which we form as to the mental condition of an acquaint-ance, depends as much upon his looks and gestures connected with his conversation and conduct as upon the words and actions them-selves, and yet it would be a hopeless task for the most gifted person to clothe in language all the minute particulars with their necessary accompaniments and qualifications which have led to the conclusion which he has formed." Denio; J., in *De Witt* v. *Barley*, 9 N. Y. 371, 389, 390. "No mere description of the wrinkles of the face, of the tones of the voice, or the color of the hair, would be likely to convey any very accurate impression as to the precise age of the person described. The case of *McKee* v. *Nelson*, 4 Cow. 355, is an example belonging to the same class. That was an action for breach of promise of marriage, and a witness who knew the plaintiff, and had observed her conduct and deportment toward the defendant, was permitted to testify whether in her opinion the plaintiff was sin-cerely attached to him: a fact which it is plain could be proved in no other way. *Trelawney* v. *Coleman*, 2 Stark. 191, is another case of the same kind. There in an action for criminal conversation, a witness who was acquainted with the parties, was permitted to give her opinion as to the degree of affection entertained by the wife for her husband. *  *  * To me it seems a plain proposition that upon enquiries as to mental imbecility arising from age, it will be found impracticable in many cases to come to a satisfactory con-clusion without receiving to some extent the opinions of witnesses. How is it possible to describe in words, that combination of minute appearances upon which a judgment in such cases is formed? The attempt to try such a question excluding all matter of opinion, would, in most cases, I am persuaded, prove entirely futile. *  *  * A witness can scarcely convey any intelligible idea

upon such a question, without infusing into his testimony more or less of opinion. Mental imbecility is exhibited, in part, by attitude, by gesture, by the tones of the voice and the expression of the eye and the face. Can these be described in language so as to convey to one not an eye-witness an adequate conception of their force? * * * It certainly strikes me that few questions can be suggested about which it is possible to raise a doubt, which are more conclusively settled by authority than that under consideration. * * * This court itself, since the former decision in this case, has, upon a question strictly analogous, unanimously established a 'different rule. I refer to the case of _The People_ v. _Eastwood_, 14 N. Y. 562. Upon the trial of that case, a witness was asked whether, at the time of the homicide, the prisoner was intoxicated. This question was objected to and excluded upon the ground that it called :for the opinion of the witness. Exception was taken to this ruling, and upon that exception the case was brought to this court where it was unanimously held that the evidence ought to have been received, and a new trial was granted for that among other. reasons. The ad-:missibility of the evidence was there placed upon the precise ground which has been assumed here, viz., that the appearances which indicate intoxication, cannot be so perfectly described in words as to enable persons not eye-witnesses to judge with accuracy on the subject. The questions in that case and in this, are, in principle, identical, and opinions cannot be held inadmissible in the present case, without virtually overruling that of Eastwood." _De Witt_ v. _Barley_, 17 N. Y. 340, 344, 348, 350, 352.

" A witness may state facts, may give the look of the eye, and the action of the man, but unless he is permitted to express an opinion, he cannot convey to the mind distinctly the condition of the man that such acts and looks portray." _In the matter of Vanauken_, 2 Stock. Ch. 186, 192. How can a witness " give the look of the eye," without giving an opinion? " The opinion of a witness as to the sanity of a person depends for its weight, on the capacity of the witness to judge, and his opportunity." _Burton_ v. _Scott_, 3 Rand. 399, 403. " And so it is in regard to questions respecting the temper in which words have been spoken, or acts done. Were they said or done kindly or rudely—in good humor or in anger; in jest or in earnest? What answer can be given to these enquiries if the observer is not permitted to state his impression or belief? Must a _fac-simile_ be attempted so as to bring before the jury the very tone, look, gestures, and manner, and let them collect thereupon the disposition of the speaker or agent? * * * Unquestionably before a witness can be received to testify as to the fact of capacity, it must appear that he had an adequate opportunity of observing and judging of capacity. But so different are the powers and the habits of observation in different persons, that no general rule can be laid down as to what shall be deemed a sufficient opportunity of observation, other than it has in fact enabled the observer to form a belief or judgment thereupon. So it is in the analogous case of

handwriting. If a witness declares that he has seen the party write, whether 'it has been once only or a thousand times, this is enough to introduce the enquiry, whether he believes the paper pioduced to be the party's handwriting. His belief is evidence, the weight of which must depend upon a consideration of all the circumstances under which it was formed." *Clary* v. *Clary*, 2 Ired. 78. Judge Redfield says of the decision in *Clary* v. *Clary*, "The learned judge shows with great ability and abundant success, in our judgment, that the rule here adopted, is the only one consistent with principle." 1 Redfield on Wills 143, n. 16.

" A careful daily observer of a person feigning madness, would witness innumerable acts, motions and expressions of countenance, which, with the attending incidents and circumstances, would conclusively satisfy him of the fictitious character of the pretended malady, but which he could never communicate to a jury or scientific man, so as to give them a fair conception of their real importance. From poverty of language, these facts, should a witness attempt to detail them, would necessarily be mixed up with opinions general or partial, in spite of his best efforts to avoid it. There are things well known to all persons, which our language only enables us to express by words of comparison—such are the peculiar features of the face indicating an excitement of the passions, affections and emotions of the mind, as hope, fear, love, hatred, pleasure, pain, &c. Testimony affirming the existence or absence of either of these, is but a matter of opinion. So the statement of the fact that a man's whole conduct is natural, is but the opinion of the witness, formed by comparing the particular conduct spoken of, with the acts of the past life of the individual. It would hardly be claimed that such evidence should be excluded, yet it is equivalent to an opinion that the person is sane." *Clark* v. *State*, 12 Ohio 483, 490. It must appear that "the facts upon which it is based, have come under his own observation." *Doe* v. *Reagan*, 5 Blackf. 217. The subject is fully considered in *Beaubien* v. *Cicotte*, 12 Mich. 459, 495—508, and other cases.

Objection has been made to some of the cases in which it has been said that mere opinions were slight evidence. This has been said in some chancery cases, in which the judge passing upon fact as well as law, has expressed his opinion of the weight of certain testimony as a matter of fact within his power to decide. In other cases tried by jury, judges have expressed their opinions of the weight of this evidence as they were accustomed to express their opinions of the weight of other evidence. The practice, having been firmly fixed and universal, has often been as visible in the decisions of the court as in summing up the evidence to the jury. It embraces all evidence alike, and has no bearing upon the competency of particular testimony, which is the point now before us. The practice is obsolete in this state, but it is settled by authority that, at common law, the judge may give the jury his opinion of the weight of any part or of the whole of the evidence—with this limitation, that he is not to give such

opinion as imperative upon the jury—they are to understand that they are the judges of the facts.     2 Hale's Hist. Com. L. 147 ; *King* v. *Fisher*, 1 St. Tr. 395, 402 ; *King* v. *Cullender & a.*, 6 St. Tr. 687, 700 ; *King* v. *Keach*, 6 St. Tr. 701, 706, 709 ; *King* v. *Green & a.*, 7 St. Tr. 159, 214, 215, 216, 217, 218, 219 ; *King* v. *Colledge*, 8 St. Tr. 550, 713, 726 ; *King* v. *Hardy*, 24 St. Tr. 1362, 1363, 1383 ; *Brembridge* v. *Osborne*, 1 Stark. 374 ; *Petty* v. *Anderson*, 3 Bing. 170, 171, 172, 173 ; *Solarte* v. *Melville*, 7 B. & C. 430, 435 ; *Davidson* v. *Stanley*, 2 M. & G. 221 ; *Calmady* v. *Rowe*, 6 M. G. & S. 861, 893 ; *Doe* v. *Strickland*, 8 M. G. & S. 743 ; *Pennell* v. *Dawson*, 18 Com. B. 355, 370 ; S. C. 36 Eng. L. & Eq. 431, 440 ; *Attorney-General* v. *Good*, M'Clel. & Y. 286 ; *Sutton* v. *Sadler*, 3 Com. B. (N. S.) 87, 98, 101, 103 ; *Queen* v. *Townley*, Ann. Reg. 1863, part 2, pp. 306–309 ; *Duberly* v. *Gunning*, 4 T. R. 651, 652 ; *Tyrwhitt* v. *Wynne*, 3 B. &. Ald. 556, 560, 561 ; *Rex* v. *Burdett*, 4 B. & Ald. 131, 167 ; 1 Am. L. Rev. 59 ; *Carver* v. *Jackson*, 4 Pet. 1, 80 ; *Garrard* v. *Reynolds*, 4 How. (U. S.) 123 ; *Harrison* v. *Rowan*, 3 Wash. C. C 580 ; *Phillips* v. *Kingfield*, 19 Me. 375 ; *Cunningham* v. *Batchelder*, 32 Me. 316 ; *Nutting* v. *Herbert*, 37 N. H. 346, 355 ; *Buckminster* v. *Perry*, 4 Mass. 593, 594 ; *Com.* v. *Child*, 10 Pick. 252, 256 ; *Curl* v. *Lowell*, 19 Pick. 25 ; *Davis* v. *Jenney*, 1 Met. 221 ; *Whiton* v. *O. C. I. Co.*, 2 Met. 1 ; *Eddy* v. *Gray*, 4 Allen 435 ; *State* v. *Lynott*, 5 R. I. 295 ; *F. B. Church* v. *Rouse*, 21 Conn. 160, 167 ; *N. Y. F. I. Co.* v. *Walden*, 12 Johns. 513 ; *Gardner* v. *Picket*, 19 Wend. 186 ; *Lansing* v. *Russell*, 13 Barb. 521 ; *Hunt* v. *Bennett*, 4 E. D. Smith 647 ; *Bulkeley* v. *Ketellas*, 4 Sandf. 450 ; *Grove* v. *Donaldson*, 15 Pa. 128 ; *Oyster* v. *Longnecker*, 16 Pa. 269 ; *Stoddard* v. *McIlwain*, 7 Rich. 525 ; *Still* v. *Glass*, 1 Ga. 475.

What was the New Hampshire rule as to the competency of the evidence, before the decision of *Boardman* v. *Woodman?*

In May, 1811, *State* v. *George Ryan*, was tried in Cheshire, before Livermore, Ch. J., and Steele, J.   The Attorney General appeared for the state, and Chamberlain, Hubbard and Vose for the defendant. The defence was insanity.   Of non-expert witnesses called by the state, one testified that at the trial before the magistrate, the defendant " wished an adjournment of his examination—appeared to argue his motion for it like a man of understanding and discretion ;" another testified that he " had no idea from what he saw of the defendant    *    *    *    that he was any way deranged—the prisoner then appeared to have the full use of his reason ;" another testified that the defendant " appeared to be perfectly in possession of his faculties    *    *    *    no appearance of derangement."   Of non-expert witnesses called by the defendant, one testified that the defendant conducted on one occasion " like a man without sense ;" another testified that in the morning of a certain day, the defendant " was perfectly rational—in the afternoon, became wild ;" another confirmed the last ; another testified that the defendant " appeared rational." Non-expert witnesses gave their opinions freely without objection,

and it is evident that the counsel and the court understood such evidence to be competent. Judge Livermore, in summing up the testimony, particularly named the witnesses, who, to use his own words, " testify that in their opinion he had not the use of his reason." Pamphlet Report of *State* v. *Ryan.*

In *State* v. *Farmer,* tried in 1821, before Richardson, Ch. J., and Woodbury and Green, J. J., a witness testified that the defendant had said he would kill the deceased. On cross-examination he was asked if he thought the defendant in earnest, and he answered in the negative without objection. The charge of the court shows that it was understood that this evidence was competent. Pamphlet Report of *State* v. *Farmer.*

In October, 1830, *State* v. *Corey* was tried in Cheshire, before Richardson, Ch. J., and Green and Harris, J. J. Handerson, Wilson, and Chamberlain the Solicitor, appeared for the state ; and Woodbury, Hubbard and Joel Parker for the defendant. The trial was reported by Joel Parker. The defence was insanity. The first witness called for the defence, was the defendant's brother, not an expert. He was asked if his father was sane. " The Solicitor objected to the question, and cited *Poole & a.* v. *Richardson,* 3 Mass. 330, and other authorities to show that the opinion of the witness could not be received in evidence." What the " other authorities" were, we know only from the fact that, at that time, there were no such authorities in the world outside of the original territory of the state of Massachusetts—the slight extension of the peculiar practice of Massachusetts beyond that territory, being a very recent affair. Notwithstanding the objection explicitly urged and supported by Massachusetts precedent, Corey's brother was allowed to testify "His father is crazy," and his sister " is wild as a hawk." At least six other non-expert witnesses testified to their opinions that various relatives of the defendant had been insane. One testified that the defendant was not insane at the time in question. One testified that the defendant looked and acted like a crazy person. The court asked one witness if the defendant, on a certain occasion, appeared rational ; and received an affirmative answer. Many non-expert witnesses, on the part of the state, testified that they had known the defendant, and had never known of his being insane. One testified there " was one time when he saw him *out*—cannot say whether he had been drinking or not." Several testified that they had " never known of his being deranged except from liquor." We are informed by the reporter of the case that his report of the charge given to the jury by Judge Richardson, was submitted to, and revised by, Judge Richardson himself before publication. The charge shows that it was not doubted that the opinions were competent. Judge Richardson expressly said that the opinions formed the day before the homicide, by persons in a situation which enabled them to judge, were " entitled to great weight."

Here was the first attempt made to introduce into this state, the Massachusetts exception which was then twenty-three years old. The

total failure of the attempt; the citation, consideration and rejection of the Massachusetts cases; the admission of the opinions; the question put to one of the witnesses by the court; and the declaration of Judge Richardson that the opinions formed the day before the homicide, were entitled to great weight, notwithstanding the Massachusetts authorities cited to show they were not admissible, render this a case of the very highest authority. To cite the Massachusetts cases as in conflict with *State* v. *Corey*, is, in this state, as unavailing as it would be to cite *Gregg* v. *Wyman*, 4 Cush. 332, as in conflict with *Woodman* v. *Hubbard*, 25 N. H. 67, 76, 77, where *Gregg* v. *Wyman* was held not to be law. The cases in Maine, as we have seen, cannot be regarded as any thing else than Massachusetts authority. And thus all existing precedents which have been cited from other jurisdictions as in conflict with *State* v. *Corey*, are disposed of, except the Texas case. As no authority was cited and no ground stated for the decision of the latter case, we could not be expected to follow it, and to overthrow the overwhelming mass of English and American authorities including those of our own state, without some urgent reason for so doing.

At the August term, 1832, in Rockingham, held by Judge Green and Judge Harris, the case of *Hamblett apt.* v. *Hamblett* was tried. The appellee " offered in evidence the deposition of Mary Palmer in which she testified, among other things, that on the day of the execution of the will, she was at the house of the testator, and that 'his discourse was satisfactory to her.' To this part of the testimony, the appellant objected. The evidence was admitted, but the court, in their instructions to the jury, directed them not to rely upon any evidence of opinion as to the sanity or insanity of the testator, except what was derived from the testimony of the subscribing witnesses to the will." Questions raised at the trial were decided Dec. 1833, when the court consisted of Richardson, Green, Parker and Upham. Judge Parker delivering the opinion of the court, said that the whole force and effect of some of the evidence relating to certain persons was "to show their opinions that the testator was sane. * * * It could be used only to show that they treated the will as valid and binding on them, and that the inference therefore was, that they were heretofore of opinion that the sanity of the testator could not be questioned. In this view, it would seem to stand upon the same ground as the matter which forms another objection on the part of the appellant, which is to the admission of the testimony of Mary Palmer that she had a conversation with the testator on the day of the execution of the will, and that ' his discourse was satisfactory to her.' This is wholly immaterial unless it be as evidence of the opinion of the witness that the testator was sane. But the case finds that the judge expressly directed the jury not to rely upon any evidence of opinion as to the sanity or insanity of the testator, except what was derived from the testimony of the subscribing witnesses to the will. On the supposition that this testimony of Mary Palmer to matter of opinion, or rather to matter from which her opinion of sanity is to be inferred,

was incompetent—which is not conceded, if sufficiently connected with facts—the question arises whether this furnishes any ground for a new trial, the court having thus directed the jury."

After deciding that question, and holding that if the evidence had been incompetent, the exclusion of it after it had been received, would obviate the objection made to its admission, Judge Parker said, " As to the direction of the judge, relative to evidence of opinion, it may be proper to remark that we do not intend to be understood as establishing this as the rule.   The weight of authority seems to be in favor of admitting the opinions of others than the witnesses to the will, if connected with evidence of the facts upon which those opinions are founded.   3 Stark. Ev. 1707 *in notes;* 4 Conn. Rep. 203 *Grante* v. *Thompson;* Vide also 8 Mass. 371, *Hathorn* v. *King*; 4 Mass. 594, *Buckminster* v. *Perry*: 2 W. Black. 365, *Lowe* v. *Jolliffe*. It remains to be considered whenever the question shall directly arise whether this is not the most eligible and proper course in questions of this nature ; but upon this matter it is not now necessary to make a decision." *Hamblett* v. *Hamblett,* 6 N. H. 333, 336, 344, 349.   This is a strong intimation that the doctrine of *State* v. *Corey,* had not been, and was not likely to be, abandoned.

In September, 1834, *State* v. *Prescott*, was tried in Merrimack, before Judge Richardson and Judge Parker. George Sullivan, Attorney General, and John Whipple, Solicitor, appeared for the state ; Ichabod Bartlett and Charles H. Peaslee for the defendant.   The defence was insanity.   A large number of non-expert witnesses testified to their opinions ot the sanity or the insanity of the defendant and some of his relatives ; and no objection was made to the competency of the opinions.   The case was sharply and strenuously contested on each side ; it was tried according to the strict rules of law as then understood ; the distinguished counsel on both sides, insisted upon a rigid observance of those rules ; they waived no objection that occurred to them ; nothing was yielded to courtesy, convenience or humanity ; in no case tried in this state, since that time, has there been a greater display of zeal, acuteness and power on the part of counsel.   It is reasonably certain that if it had been supposed to be doubtful whether the opinions of non-experts were admissible, objection would have been made to them.   Those opinions were argued by the counsel, and considered by the court and jury as evidence ; and there is no reason to suspect that any one engaged in the trial, thought they were not evidence.

In addition to these precedents, we know, upon the most authentic information, that, down to the time when Judge Parker left the bench in 1848, he did not understand that the early New Hampshire practice with which he had been familiar in *State* v. *Corey,* and *State* v. *Prescott*, and of which he had expressed his approval in *Hamblet.* v. *Hamblett*, had been abolished, and the contrary Massachusetts practice established in its place.   After the delivery and publication of his opinion in *Hambtett* v. *Hamblett*, it is not probable that he would assent to a silent reversal of the doctrine of *State* v. *Corey,*

or allow it to be reversed without some reason for or against the innovation, being put on record.

This brings us down to a recent period. Whatever uncertainty there is, has arisen since Judge Parker presided in this court. In 1848, when he retired from the bench and removed from the state, the decision in Texas had not been made, but the Massachusetts exception had been disapproved in *Hamblett* v. *Hamblett*, and rejected in *State* v. *Ryan*, *State* v. *Corey*, and *State* v. *Prescott*. Down to 1848 there is no doubt that the doctrine of *Poole* v. *Richardson*, was not the law of this state. This is a matter as to which we have dates. The doctrine of *Poole* v. *Richardson*, was not brought from England with the body of the common law; it was a ruling, first made in this country in the present century; it had not gained a foothold in this state twenty-one years ago; and was never recognized in our decisions until 1865.

After Judge Parker left the state, and before the trial of *Boardman* v. *Woodman*, the question of sanity was tried in a few cases, and so far as any practice can be said to have grown up in those few cases, in those seventeen years, it grew into conformity to the Massachusetts exception. So far as it amounted to anything, it was a silent, unauthentic growth, and it is very easily explained. No judge remained on the bench who had participated in the decision of *Hamblett* v. *Hamblett*, or in the trial of the early cases. The significant observations of Judge Parker, in *Hamblett* v. *Hamblett*, were not kept prominently before the profession by any head-note or digest. They were enveloped in a case of eighteen pages, and in a part of it not likely to be often, if ever, read; they were entirely overlooked or forgotten. The pamphlet reports of *State* v. *Ryan*, *State* v. *Corey*, and *State* v. *Prescott*, were scarce, seldom if ever read, and substantially unknown; and the surviving counsel who had been engaged in those trials, were no longer on active duty at our bar, and had no occasion to remonstrate against the change of our practice. The Massachusetts exception prevailed in the territory adjoining us on the south and east. The Massachusetts reports were used more than any others except our own. The legal treatises referring to this subject, in most common use among us, were written or edited by Massachusetts men who were not aware that the doctrine of *Poole* v. *Richardson* was a peculiarity of their state, and who stated the Massachusetts exception to be the common law as they erroneously supposed it was. Greenleaf on Evidence, and Massachusetts editions of Jarman on Wills, exercised a potent influence in the introduction of that great mistake. 1 Gr. Ev. § 440; 1 Jarman on Wills 77, (Mass. Ed.) In the second and subsequent Massachusetts editions of Jarman, the third chapter of the first volume of the English edition was omitted, and a new chapter by the Massachusetts editor, was inserted in its place. In the text of this new chapter, the editor gives the peculiar, local rule of *Poole* v. *Richardson*, as if it were common law. It was stated in the advertisement to the second edition, that the editor had added this new

chapter to the original text; but the authorship of this chapter was very likely to escape observation in the use generally made of the book.

There was one peculiarity in our practice which opened the way for the introduction of the Massachusetts exception. In 1826, when the court consisted of Richardson, Green, and Harris, the case of *Rochester* v. *Chester*, 3 N. H. 349, was decided, in which, Judge Richardson, being an inhabitant of Chester, did not sit. It was there held that witnesses could not testify their opinions of the value of land. The decision of Green J. and Harris J. was reported. In *Peterboro'* v. *Jaffrey*, 6 N. H. 462, in which case Judge Parker did not sit, the exception introduced in *Rochester* v. *Chester*, was followed; it was then necessarily applied to sleds and all other property; and it continued in force (*Low* v. *R. R.*, 45 N. H. 370, 383,) until its excessive inconvenience in practice could no longer be endured, and it was rescinded by the legislature. Gen. St. ch. 209, sec. 24. After Judge Bell came to the bench, the court were never unanimous against restoring the common-law rule which admitted opinions of the value of property; but, in accordance with the general usage, no dissent was publicly expressed.

The exception introduced by Judge Green and Judge Harris in *Rochester* v. *Chester*, was peculiar to this state; it seems never to have prevailed anywhere else in the whole world. 1 Redfield on Wills 137, 3, c; *Crane* v. *Northfield*, 33 Vt. 126; *Clark* v. *Baird*, 9 N. Y. 183; *De Witt* v. *Barley*, 17 N. Y. 342, 343; *Kellogg* v. *Krauser*, 14 S. & R. 137, 142; *Laney* v. *Bradford*, 4 Rich. 1; *Beaubien* v. *Cicotte*, 12 Mich. 507. Not only was it a local peculiarity; it was a troublesome and mischievous one. Unless the jury could have a view of the property in question, they could not generally have satisfactory evidence of its value; and if they could have a view of it, their information would generally have been greatly increased by the opinions of persons familiar with the property and with circumstances affecting its value. . It was unjust; it often resulted in excessive, often insufficient, damages. It was expensive and annoying; the parties were compelled to summon a greater number of witnesses than would have been necessary if their opinions could have been taken; and the process of obtaining from them such testimony as they were allowed to give, and excluding their opinions, was difficult and tedious. It was inconsistent with itself; before the decision of *Low* v. *Railroad*, in 1864, witnesses were allowed to testify that other similar property had been actually sold for a certain price, (*Hackett* v. *B. C. & M. R. R.*, 35 N. H. 390, 392, 398); their statement of the similarity of property involved their opinion, as was suggested by Judge Wilcox in *Whipple* v. *Walpole*, 10 N. H. 131, and by Judge Parker in *Beard* v. *Kirk*, 11 N. H. 401. The witness who was not permitted to say that he thought a certain horse was worth more or less than a thousand dollars, was permitted to give his opinion of the age, size, weight, form, speed, strength, endurance, health, appetite, docility, timidity, and general disposition of the

horse.   He was permitted to give his opinion on these points, because his statement of facts without opinion was not the best evidence: and, for the same reason, the common law allows him to give his opinion of the value.   The great legal objection to *Rochester* v. *Chester*, is, that it was a violation of the elementary rule of law which allows the best evidence to be given, of which the case in its nature is susceptible.   Opinions are the best evidence "where language is not adapted to convey those circumstances on which the judgment must be formed."   *Clark* v. *Baird*, 9 N. Y. 183, 196. Opinions are the best evidence when, " from the nature of the subject to be investigated, it cannot be so described in language as to enable persons not eye-witnesses to form an accurate judgment in regard to it.   *   *   *   No description of a sled could enable a jury to judge as accurately of its value as one who had an opportunity of examining it.   Two sleds may be made of the same materials, and the same dimensions, and the value of one be three times that of the other ; as two horses may have legs of the same length, heads of the same size, and hair of the same color, and yet be widely different in value." *De Witt* v. *Barley*, 17 N. Y. 342, 343.

Opinions, like other testimony, are competent in the class of cases in which they are the best evidence, as when a mere description without opinion would generally convey a very imperfect idea of the force, meaning, and inherent evidence of the things described.   Like other testimony, opinions are incompetent in the class of cases in which they are not the best evidence, as when they are founded on hearsay, or on evidence from which the jury can form an opinion as well as the witness.   A rule that opinions are, or are not, evidence, must necessarily be in conflict with the rule which admits the best evidence.   A constant observer of the trial of cases, examining the testimony for the purpose of ascertaining how many opinions are received and how many rejected, will find ten of the former as often as he finds one of the latter ; and, if he is very critical, he will find the ratio much greater than that.   Opinions are constantly given.   A case can hardly be tried without them.   Their number is so vast, and their use so habitual, that they are not noticed as opinions distinguished from other evidence.

" It has been said that a witness must not be examined in chief as to his *belief* or *persuasion*, but only as to his knowledge of the fact, since judgment must be given *secundum allegata et probata;* and a man cannot be indicted for perjury who falsely swears as to his persuasion or belief.   As far as regards mere belief or persuasion, which does not rest upon a sufficient and legal foundation, this position is *correct*; as where a man believes a fact to be true merely because he has *heard* it said to be so ; but with respect to persuasion or belief, as founded on facts within the actual knowledge of the witness, the position is not true.   On questions of identity of persons and of handwriting, it is every day's practice for witnesses to swear that they believe the person to be the same, or the handwriting to be that of a particular individual, although they will not swear positively ;

and the degree of credit to be attached to the evidence, is a question for the jury. With regard to the second objection, it has been decided that a man who falsely swears that he thinks or believes, may be indicted for perjury." 1 Stark. Ev. 153.

The cases of identity of persons and things, and of handwriting, having been named in the English books, as illustrations of the competency of opinions, those cases were supposed to be peculiar exceptions to the general rule, whereas they are mere instances of the application of the general rule which admits the best evidence. This general, natural, fundamental, comprehensive, and chief rule of evidence, was gradually ignored, and special and artificial rules were substituted; or, if there was not an absolute substitution, there was such a removal of emphasis from the general rule to the special ones, that the former lost the overshadowing influence and control which belong to it. Entire systems of law, theology, medicine, and philosophy, are easily changed by a transfer of emphasis from one point to another. To say the least, the emphasis which belongs to the general rule admitting the best evidence, was gradually taken from it, and placed upon the fact that there are some opinions which, not being the best evidence, are not evidence; and this fact was gradually transformed into a so-called general rule that opinions are not evidence, and this artificial rule was treated as a rule of law. The objection to this supposed rule against opinions, is, that it has usurped the place of the supreme rule admitting the best evidence; that it is a mere statement of the supposed fact that opinions are not admitted under the rule of the best evidence; and that as a statement of that kind, it is not true.

The local peculiarity of *Rochester* v. *Chester*, tended strongly to build up, and give unlimited emphasis to, the supposed rule against opinions. If a farmer could not give his opinion of the value of his neighbor's farm, horse, or sled, of a ton of hay or bushel of potatoes, there was a difficulty in showing on what ground he could give his opinion of his neighbor's sanity. The legislature restored the common law in reference to opinions of values; the court ought to restore the common law in reference to opinions of sanity.

The anomaly of our present practice is easily traced to its source. The innovation and error of *Poole* v. *Richardson*, crept into this state surreptitiously, between 1848 and 1865, after it had been kept out more than forty years, and after the formal attempt to introduce it, in *State* v. *Corey*, had signally failed. Being open to all, and more than all, the objections made against *Rochester* v. *Chester*, and having lost its sole support when that innovation and error was swept away, it should be allowed to disappear.

When the fact that some opinions are not the best evidence, had been magnified and turned into the so-called general rule of law that opinions are not evidence, and the rule admitting the best evidence was supplanted by it, it was thought necessary to find a special precedent for every opinion before it could be admitted. The judgments of Westminster Hall were searched to find a decision that an

opinion as to value of property was competent; and to find another decision that an opinion as to sanity was competent. No such decisions could be found. None had ever been made because such opinions had always been received as unquestionably competent. The reason of the failure to find the decisions was not understood here. The failure was taken as conclusive proof that, in England, the opinions were not admitted. When an American mistake of this magnitude is discovered, it is fit to be corrected at once. To return to the true principle, is not to change the law, but to cease violating the law; or, putting it in a milder form, to allow that which is the law *de facto*, to yield to that which is the law *de jure*.

In criminal cases, it is often a question how nearly a footprint in earth or snow, corresponded to the form of a shoe of the prisoner. A witness who has seen the footprint and the shoe, is allowed to give his opinion on the subject, because a mere description of forms would not be the best evidence. If a plaster cast of the track, or the original impression itself preserved by freezing, could be produced, this evidence of its form would be more satisfactory than any verbal description. So it is when an impression has been made upon the mind of a witness by the appearance and conduct of the prisoner, indicating sanity or insanity; that impression is the best evidence the witness can give on the subject. His description of the appearance and conduct, is, in fact, but indirect and imperfect evidence of the impression; when he gives the original impression itself, it is as if a footprint were brought into court.

In 1795, Sir A. G. Kinloch was tried for the murder of his brother Sir Francis Kinloch. 25 St. Tr. 891, 985. Sir Francis, in making an attempt to seize and confine the defendant, had been killed by him. The defence was insanity. In the argument of Mr. Hope for the defendant, the weight of opinions of insanity was presented in this manner : " And now, gentlemen, in the face of all this evidence, in opposition to the opinion of every friend who saw him, in opposition to the advice of every professional person consulted on the occasion; in opposition to the impression of the family ; to the attempt of Sir Francis ; you, sitting here, wanting the strong evidence which they had, his eyes, his looks, his gestures, his tones, his whole demeanor ; you, sitting here, I say, are desired presumptuously to determine that all, all were mistaken ; that the prisoner was not mad, and coercion not necessary ; and this you are desired to do ;—Why? Because he killed his brother ! Wonderful conclusion ! If anything was wanting to confirm the evidence arising from the opinion of the family, that fatal event puts it beyond doubt. If it could be doubted whether Sir Francis too thought him totally deranged ; I answer, he has sealed his opinion with his blood. They had been taking precautions all night against danger and mischief from the prisoner ; and when the dreaded mischief happens, it is given you as a proof that their precautions were unnecessary ; admirable logic ! that they apprehended danger is clear.—Why? They have told you because they thought him mad; the mischief

happens; and that which they dreaded as the natural conseqence of his madness, you are to take as a proof of the soundness of his understanding." If the evidence thus argued by Mr. Hope, was inadmissible, the court should not have allowed him to make that argument. But if a prosecuting officer should object to such an argument being made, was there ever a court that would sustain the objection?

A non-expert may testify that, in his opinion, the plaintiff was sincerely attached to the defendant, (*M'Kee* v. *Nelson*, 4 Cow. 355, cited as law in *Robertson* v. *Stark*, 15 N. H. 114) ; that the plaintiff " seemed satisfied " with a business arrangement proposed to him by the witness, (*Bradley* v. *S. F. M. Co.*, 30 N. H. 487, 491) ; that the witness thought a horse " was not then sound, * * * his feet appeared to have a disease of long standing," ( *Willis* v. *Quimby*, 31 N. H. 485, 487) ; that a horse " appeared to be well, and free from disease, that he traveled well, ate well, breathed freely" ; that " running him round the yard he showed distress in his breathing" ; that he thought he " never saw any indication of the horse being diseased," (*Spear* v. *Richardson*, 34 N. H. 428, 429, 430, 431) ; that there were, at a certain place, " some hard excavations, but nothing approaching the nature of hard pan," ( *Currier* v. *B. & M. R. R.*, 34 N. H. 498, 501, 508) ; that a lady's health, in the opinion of the witness, " had not been near so good since " a certain time " as before", " that she had a very severe fit of sickness in the fall of 1861, and that she recovered very slowly after she began to mend," that the witness " considered her very sick " ; that the defendant, in carrying a barrel of flour at one time, and a barrel of sugar at another, " seemed to carry them easily " ; " that he should call the defendant a very active man " ; " that he had a scuffle with " the defendant, in which the defendant " was too much for him," (*State* v. *Knapp*, 45 N. H. 148, 149, 154) ; that the witness " did not see any appearance of fright " in a horse at the time of an accident, that the horse " did not appear to be frightened in the least, before he went off the bank or afterwards," that " he appeared to be rather a sulky-dispositioned horse to use," ( *Whittier* v. *Franklin*, 46 N. H. 23) ; that a carriage not seen by the witness, appeared, from the sound, to start from a certain point, (*State* v. *Shinborn*, 46 N. H. 497, 501) ; that the plaintiff " seemed to suffer, and seemed weak and debilitated," that " she did not seem to be excited, frightened," that " she was lamer in the morning " than the day before, (*Taylor* v. *Railroad*, 48 N. H. 304, 306, 309) ;* and, since the restoration of the common law, opinions of the value of property are admitted here as well as everywhere else.

If opinions of physical condition are competent, opinions of mental condition must be competent. The difficulty of proving physical health or disease, without opinion, makes opinion a legal

---

*See *Cooper* v. *Railway*, *ante* 211, 212.

grade of best evidence; the difficulty of proving mental health or disease, without opinion, is still greater, and makes opinion more palpably a class of best evidence.

Lord Hale recognized the similarity of insanity and intoxication, and treated of both under the head of "Idiocy, Madness and Lunacy." After describing " *dementia naturalis*," and "*dementia accidentalis*," he says, " The third sort of *dementia* is that which is *dementia affectata* namely *drunkenness*. This vice doth deprive men of the use of reason, and puts many men into a perfect but temporary phrenzy; * * * such a person shall have no privilege by this voluntary contracted madness, but shall have the same judgment as if he were in his right senses." 1 Hale P. C. 32.

In this case, it is unanimously decided that witnesses, not experts, were properly allowed to testify that, at times the defendant did appear, and, at times, did not appear, to be under the influence of intoxicating liquor.

Admitting opinions of the influence of alcohol, and rejecting opinions of insanity, is arbitrary. It was not so in Judge Richardson's day. In *State* v. *Corey*, one witness testified there was one time when he saw the defendant " *out*—cannot say whether he had been drinking or not"; and several testified that they had " never known of his being deranged except from liquor." Exclude opinions of the influence of alcohol, and, in many cases, it would be a trying task for the jury to guess, upon the evidence, whether the defendant was intoxicated or insane. The appearances and conduct which gave to one witness an impression that this defendant was intoxicated, may have given to others the impression that he was insane; and when a man is on trial for his life, the state is not entitled to a monopoly of the opinions.

Under the exception of *Poole* v. *Richardson*, counsel who have introduced evidence tending to show insanity, have, in most, if not in all, cases, been painfully aware of the fact that their client's cause suffered unjustly from the suppression of an important class of the best evidence. The exclusion of opinions is practically a one-sided exclusion. A witness for the state, is allowed to say that the defendant appeared natural or as usual; that is a clear opinion; and it is understood and taken by the counsel, court and jury, as a full and explicit opinion that the defendant was sane. If the witness should testify in terms, that, in his opinion, the defendant was sane, the effect of his testimony would not be altered in the slightest degree. On the other side, a witness is allowed to say that the defendant did not appear natural, or did appear peculiarly or strangely; that also is a clear opinion; and if it were necessarily understood and taken as a full and explicit opinion that the defendant was insane, there would be no injustice, and the exception excluding opinions would be totally abolished. If " unnatural", by its peculiar use in this connection, should, in evidence, come to be synonymous with " insane ", as " natural " is understood to be synonymous with "sane", the legal question now under consideration

would dwindle to a point of literary taste. But the effect of the opinion that the defendant did not appear natural, or did appear peculiarly or strangely, falls far short of the effect of an opinion that he appeared to be insane; and the state has this great and unfair advantage over the accused. If he has feigned insanity for the purpose of escaping punishment, a mere narration by the witnesses of their observations of him, would probably appear like very strong evidence of insanity; whereas this evidence might be properly and truthfully rebutted by their opinions; they might have observed evidence of simulation which they could not describe. And thus the modern, eccentric, *nisi prius* ruling supposed by Mr. Tyng to have been made in *Poole* v. *Richardson*, and unfortunately published by him, operates unavoidably to oppress and endanger the accused who, by reason of insanity, are innocent; and to encourage crime by shielding the guilty who feign insanity. Objectionable as the new dogma is in all the details of its practical operation, it is also, in a purely legal view, a violation of the elementary principle which admits the best evidence.

II. One witness testified that he shut up his shop, and started to go away when the defendant was there; and another testified that he left a bed in which the defendant was, and went to sleep in another bed. This evidence was introduced to show that these witnesses were afraid of the defendant; and their fears were proved in this way to show that in their opinions the defendant was insane.

If their acts could be proved to show their fears, and their fears be proved as evidence of their opinions, they could testify directly to their opinions, and say that they were afraid of the defendant because they thought him insane.

When the testimony of witnesses is offered to prove that they treated the defendant as an insane man, it amounts to an offer to prove by the witnesses, a previous practical expression of their opinions; and the question arises whether their conduct is a species of the best evidence of their opinions. This question concerns not the competency of their opinions, but the method of proving them. Whatever the true method may be in theory, a question of sanity is seldom if ever tried without a very effective use being made of evidence showing that the person whose sanity is in controversy, was, or was not, treated as an insane person by his family, neighbors, friends, or acquaintances. *Stewart* v. *Lispenard*, 26 Wend. 268, 269, 292, 310, 311, 316. When evidence is offered tending to show how he was treated by other persons than the witnesses, the further question arises, under what circumstances, acts showing opinions, can be regarded as a class of the best evidence when the actors do not testify under the sanction of an oath, and cannot be subjected to the test of cross-examination. *Wright* v. *Tatham*, 5 Cl. & Fin. 670; S. C. 4 Bing. N. C. 489; 1 Gr. Ev. § 101, n. Hearsay, without such sanction and test, is sometimes the best evidence. 1 Gr. Ev. § 103–105, 127–146; 1 Phill. Ev. 285, (4th Am. Ed.); 3 Am. L. Reg. (N. S.) 641; *Hinkley* v. *Davis*, 6 N. H. 210;

*Rand* v. *Dodge*, 17 N. H. 343 ; *Wheeler* v. *Walker*, 45 N. H. 355 ; *Adams* v. *Blodgett*, 47 N. H. 219.

III. The defendant's exception to the instructions given to the jury in relation to his responsibility as affected by dipsomania, raises the general question of the legal tests of insanity ; for if the instructions given upon dipsomania, are correct, they would be correct when given upon any other alleged form of insanity.

If knowledge of right and wrong, or delusion, is the test in other alleged forms of insanity, knowledge and delusion must be the test in alleged dipsomania. The correctness of all the instructions given on the tests of mental disease, is involved in the exception taken by the defendant.

This was the first instance in which such instructions were ever given ; but they are an application of ancient and fundamental principles of the common law. A product of mental disease is not a a contract, a will, or a crime ; and the tests of mental disease are matters of fact. *Boardman* v. *Woodman*, 47 N. H. 147–150. Tried by the standard of legal precedent, the instructions are wrong ; tried by the standard of legal principle, they are right. We have come to a point where we can plainly see that the paths of precedent and principle diverge, and where we must choose between them. In making our choice there are various considerations which weaken the attraction of precedent.

A striking and conspicuous want of success has attended the efforts made to adjust the legal relations of mental disease. In regard to the validity of a contract as affected by insanity, the authorities have been conflicting and vacillating. Littleton says, "No man of full age shall be received in any plea by the law to disable his own person." Co. Lit. 246 b. Coke says, " There have been four several opinions concerning the alienation or other act of a man that is *non compos mentis*, &c. For, first, some are of opinion, that he may avoid his own act by entry or plea. Secondly, others are of opinion, that he may avoid it by writ, and not by plea. Thirdly, others, that he may avoid it either by plea or by writ ; and of this opinion is Fitzherbert in his *Natura Brevium*,     *     *     *. And Littleton here is of opinion, that neither by plea, nor by writ, nor otherwise, he himself shall avoid it, but his heir     *     *     * shall avoid it by entry, plea, or writ. And herewith the greatest authorities of our books agree ; and so was it resolved with Littleton in Beverly's case where it is said, that it is a maxim of the common law, that the party shall not disable himself." Co. Lit. 247, b. "By the law of England no man shall avoid his own act by reason of these defects." 1 Hale P. C. 29. Blackstone says, " The king indeed, on behalf of an idiot, may avoid his grants or other acts. But it hath been said that a *non compos* himself     *     *     * shall not be permitted to allege his own insanity in order to avoid such grant : for that no man shall be allowed to stultify himself, or plead his own disability. The progress of this notion is somewhat curious." Blackstone gives its history, showing that it did not prevail

in the time of Edward I; that "under Edward III. a scruple began to arise whether a man should be permitted to *blemish* himself by pleading his own insanity; and afterwards" it was doubted whether a plaintiff who had executed a release since the commencement of his suit, and who was taken to be sane at its commencement and at the time of pleading, should be permitted to plead an intermediate deprivation of reason existing at the execution of the release, "and the question was asked how he came to remember the release if out of his senses when he gave it. Under Henry VI. this way of reasoning  *  *  *  was seriously adopted by the judges,  *  *  * and from these loose authorities which Fitzherbert does not scruple to reject as being contrary to reason, the maxim that a man shall not stultify himself, hath been handed down as settled law." 2 Bl. Com. 291, 292.

In 1767, Ld. Mansfield stated the law thus, "It hath been said to be 'a maxim that no man can plead his being a lunatic to avoid a deed executed, or excuse an act done at that time, because' it is said 'if he was a lunatic he could not remember any action he did during the period of his insanity.' And this was doctrine formerly laid down by some judges; but I am glad to find that of late it hath been generally exploded; for the reason assigned for it, is, in my opinion, wholly insufficient to support it; because, though he could not remember what passed during his insanity, yet he might justly say, If he ever executed such a deed, or did such an action, it must have been during his confinement or lunacy; for he did not do it either before or since that time. As to the case in which a man's plea of insanity was actually set aside; it was nothing more than this: It was when they pleaded *ore tenus*; the man pleaded that he was at the time out of his senses. It was replied, How do you know that you was out of your senses? No man that is so, knows himself to be so. And according his plea was, upon this quibble, set aside; not because it was not a valid one if he was out of his senses; but because they concluded he was not out of his senses." *Chamberlain of London* v. *Evans*, 5 Bl. Com. App. 149, (Am. Ed. 1773). "The party himself may set up as a defence, and in avoidance of the contract that he was *non compos mentis* when it was alleged to have been made. The principle advanced by Littleton and Coke that a man shall not be heard to stultify himself has been properly exploded as being manifestly absurd and against natural justice." 2 Kent Com. 451. "Yet, clear as this doctrine appears, in common sense and common justice, it has met with a sturdy opposition from the common lawyers who have insisted, (as has been justly remarked,) in defiance of natural justice, and the universal practice of all the civilized nations in the world, that, according to a known maxim of the common law, no man of full age should be admitted to disable or stultify himself.  *  *  *  How so absurd and mischievous a maxim could have found its way into any system of jurisprudence professing to act upon civilized beings, is a matter of wonder and humiliation. There have been many struggles against it by

eminent lawyers in all ages of the common law ; but it is, perhaps, somewhat difficult to resist the authorities, which assert its establishment in the fundamentals of the common law : a circumstance which may well abate the boast so often and so rashly made that the common law is the perfection of human reason." Story Eq. § 225.

It seems to have been finally considered, in this and other jurisdictions, that a man might avoid a contract on the ground of his insanity, in all cases, excepting perhaps a contract for necessaries. *Lang* v. *Whidden*, 2 N. H. 435, 438 ; *Burke* v. *Allen*, 29 N. H. 106 ; *Seaver* v. *Phelps* 11 Pick. 304 ; *Gibson* v. *Soper*, 6 Gray 279. But it is now held that he is estopped to avoid a contract made in good faith, unless he restores the other party to his previous position, or makes compensation. *Molton* v. *Camroux*, 2 W. H. & G. 487 ; S. C. 4 W. H. & G. 17 ; *Young* v. *Stevens*, 48 N. H. 133 ; 1 Parsons Con. 383–386, (5th ed.). This result places the contracts of insane persons and minors to a considerable extent, on the same ground. *Carr* v. *Clough*, 26 N. H. 280 ; *Heath* v. *West*, 28 N. H. 101 ; *Lincoln* v. *Buckmaster*, 32 Vt. 652 ; 2 Gr. Ev. § 369, 370.

The English law, in proceedings for guardianship, has been confused and unsettled. 13 Law Magazine and L. Review, 122.

In relation to the burden of proof on the question of sanity in criminal cases, the English and nearly all the American authorities have been manifestly wrong. The uniform rule in England and the general rule in this country, has been that the burden was on the defendant to prove sanity either beyond reasonable doubt, or by a preponderance of evidence. In *King* v. *Arnold*, 16 St. Tr. 695, 764, Mr. Justice Tracy said to the jury, " the shooting my lord Onslow, which is the fact for which the prisoner is indicted, is proved beyond all manner of contradiction ; but whether this shooting was malicious, that depends upon the sanity of the man." One of the most important judicial encroachments upon the province of the jury, in England, has always been the inference of malice declared by the court as a legal presumption. The legal idea of malice includes the idea of sanity ; and the legal presumption of malice threw the burden of proving insanity on the defendant. This has always been understood, in England, as distinctly as it was by Erskine, when he said in *King* v. *Hadfield*, 27 St. Tr. 1314, 1318, " I must convince you that the unhappy prisoner was a lunatic.　*　*　*　*　The whole proof therefore is undoubtedly cast upon me" ; and by Mr. Baron Martin when he charged the jury in *Queen* v. *Townley*, Ann. Reg. 1863, part 2, p. 308, " unless they were satisfied—and it was for the prisoner to make it out—that he did not know the consequences of his act, or that it was against the law of God and man, and would subject him to punishment, he was guilty of murder." This great error was corrected in *State* v. *Bartlett*, 43 N. H. 224—a case most revolutionary in precedent, but most conservative in principle.

In testamentary cases, tried by a probate court without a jury, the court necessarily decides the fact as well as the law. In *Stewart* v. *Lispenard*, 26 Wend. 255, *Blanchard* v. *Nestle*, 3 Denio 37,

and *Clarke* v. *Sawyer*, 2 Comst. 498, it was held that mental imbecility is not testamentary incapacity unless it amounts to a total absence of reason; but this test was abandoned in *Delafield* v. *Parish*, 25 N. Y. 11. In 1826, an English judge of probate decided in *Dew* v. *Clark*, 3 Addams 79, that, as a matter of fact proved by the medical authorities of his day, delusion was the test of insanity. *Boardman* v. *Woodman*, 47 N. H. 148, 149. The courts of this country inadvertently adopted in testamentary cases, as a rule of law, the test of delusion which the English judge of probate had found as a matter of fact. And this mistake greatly increased the difficulty of extricating the subject from the embarrassments and obscurities which beset it. In 1867 it was supposed that the American doctrine of testamentary capacity was firmly established on the English probate foundation of fact mistaken here for a basis of law, when suddenly even that foundation was destroyed by the English probate court.

In *Smith & a.* v. *Tebbitt & a.*, Law Rep. 1 P. & D. 398, Sir J. P. Wilde said, " What is to be the proof of disease? What is to be the test, if there be a test, of morbid mental action? The existence of mental ' delusions,' it would perhaps be answered. But this only postpones the question, in place of answering it. For what is a mental delusion? How is it to be defined so as to constitute a test universally applicable, of mental disorder or disease. The word is not a very fortunate one. In common parlance a man may be said to be under a ' delusion' when he only labors under a mistake. The ' delusion' intended, is of course something very different. To say that a ' morbid' or an ' insane delusion' is meant, is to beg the question. For the ' delusion' to be sought is to be the test of insanity; and to say that an insane or morbid delusion is the test of insanity or disease, does not advance the enquiry. ' A belief of facts which no rational person would have believed' says Sir John Nicholl. ' No *rational* person.' This too appears open to a like objection, for what are the limits of a rational man's belief? And to say that a belief exceeds them, is only to say that it is irrational or insane. ' The belief of things as realities which exist only in the imagination of the patient,' says Lord Brougham in *Waring* v. *Waring*, (6 Moo. P. C. 354). But surely sane people often imagine things to exist which have no existence in reality both in the physical and moral world. What else gives rise to unfounded fears, unjust suspicions, baseless hopes, or romantic dreams? I turn to another definition. It is by Dr. Willis, a man of great eminence, and is quoted by Sir John Nicholl in *Dew* v. *Clark*. ' A pertinacious adherence to some delusive idea in opposition to plain evidence of its falsity. This seems to offer a surer ground: but then the 'evidence' of the falsity is to be ' plain,' and who shall say if it be so or not? In many or most cases it would be easy enough. Those who have entertained the 'delusive idea' that their bodies were made of glass or their legs of butter (as it may be found in medical works that some have done), certainly have 'plain evidence' at hand—the evidence of their senses—of its falsity. But what if the delusive idea concern a subject in which

the senses play no part, and the ' plain evidence' by which it is to be discharged is matter of reasoning and addressed to the intellectual faculty? Will all sane men agree whether the evidence is plain or not? And if not, shall one man in all cases pronounce another a monomaniac when the evidence is plain, to his reason, of the falsity of the others ideas?

I find no fault with the language of these definitions as fairly and properly describing the mental phenomena they are used to depict. I only assert that the existence of mental delusions thus defined, is not capable of being erected into an universal test of mental disease. It is no doubt true that mental disease is always accompanied by the exhibition of thoughts and ideas that are false and unfounded, and may therefore be properly called ' delusive.' But what I mean to convey on this head is this, that the question of insanity and the question of ' delusions' is really one and the same—that the *only* delusions which prove insanity are insane delusions—and that the broad enquiry into mental health or disease cannot in all cases be either narrowed or determined by any previous or substituted enquiry into the existence of what are called ' delusions.' I say in all cases, for in some such as those to which I have already alluded, where the delusive idea ought to receive its condemnation and expulsion at once from the simple action of the senses, the contrary is the case; and the same may be said of delusions obviously opposed to the simple, ordinary, and universal action of reason in healthy minds. These are the simple cases about which no one would doubt, and in them the proof of the ' delusions' is also the proof of insanity without more. But what is to be said of the more complicated cases? What if the diseased action of the mind does not exhibit itself on the surface, as it were, opposing its hallucinations to the common senses or reasons of all mankind, but can be tracked only in the recesses of abstract thought or religious speculation—regions in which the mental action of the sane produces no common result—and all is question and conflict? In what form of words could a ' delusion' be defined which would be a positive test of insanity in such cases as these? In none, I conceive, but ' *insane delusions*,' or words of the like import, which carry with them the whole breadth of the general enquiry. How then, is this question of insanity to be approached by a legal tribunal? What tests are to be applied for disease? What limits assigned within which, extravagance of thought is to be pronounced compatible with mental health? The decided cases offer no light on these heads. I nowhere find any attempt to devise such tests, or assign such limits. Nor do I conceive that any tests, however elaborate, beyond the common and ordinary method of judging in such matters, would be competent to bear the strain of individual cases in the course of experience."

The judge held it to be the duty of the court "to inform itself, as far as opportunity permits, of the general results of medical observation," and he quoted Dr. Ray, Dr. Prichard, and Dr. Esquirol. If the American law of insanity is to be that which the English probate

court holds, from time to time, to be a matter of fact depending upon " the general results of medical observation," and the progress of medical science, we have no assurance that this branch of our law will be more stable hereafter than it has been heretofore.

The attempt to establish a legal test of mental disease, has been as unsuccessful in criminal, as in testamentary cases. In England, from 1826 to 1867 delusion was applied as the test in the latter; but it was not adopted in the former; and it was not shown how it happened that what was an infallible test of mental disease in a man when he disinherited his child, was no test of mental disease in him when he deprived his child of life.

It has been held within one hundred and fifty years that the test in criminal cases is whether the defendant was totally deprived of his understanding and memory and did not know what he was doing any more than a wild beast. *King* v. *Arnold*, 16 St. Tr. 695, 765. This was the original form of the knowledge test. In 1800 the Attorney General of England declared that this test had never been contradicted, but had always been adopted. *King* v. *Hadfietd*, 27 St. Tr. 1288. Erskine, in the same case, said: "I will employ no artifices of speech.    *    *    *    The attorney-general, standing undoubtedly upon the most revered authorities of the law, has laid it down, that to protect a man from *criminal responsibility*, there must be a TOTAL *deprivation of memory and understanding*. I admit, that this is the very expression used both by lord Coke and lord Hale; but the true interpretation of it, deserves the utmost attention and consideration of the court.    *    *    *    *Delusion*, therefore, where there is no frenzy or raving madness, is the true character of insanity.    *    *    *    I really think, however, that the attorney-general and myself do not, in substance, very materially differ.    *    *    *    In contemplating the law of the country and the precedents of its justice to which they must be applied, I find nothing to challenge or question. I approve of them throughout; I subscribe to all that is written by lord Hale; I agree with all the authorities cited by the attorney-general from lord Coke." Id. 1309, 1312, 1314, 1318, 1324. The effort of Erskine was made with such "artifices of speech," that the court seem to have been mystified. When Lord Kenyon, satisfied that the defendant was insane, stopped the trial, and ordered a verdict of acquittal, his remark, that "With regard to the law as it has been laid down, there can be no doubt upon earth," apparently meant as it had been laid down by the Attorney General and by Erskine. He seems not to have understood that the ancient test was questioned; and yet, tried by that test, Hadfield must have been convicted. Hadfield's acquittal was not a judicial adoption of delusion as the test in the place of knowledge of right and wrong (9 C. & P. 546); it was probably an instance of the bewildering effect of Erskine's adroitness, rhetoric and eloquence.

The common instincts of humanity have abandoned the original "wild-beast" form of the knowledge test, only to adopt others equally ar-

bitrary, though less shocking to the intelligence and sensibility of the age. · Knowledge of right and wrong, in some degree, with more or less of explanation and variation, has always been, in theory, the test of criminal capacity in England, and generally in this country : the English courts have never recognized delusion as the test. They have noticed delusion only so far as it destroyed the knowledge of right and wrong ; which is the same as an explicit rejection of it as a test. If knowledge of right and wrong is the test, it is immaterial whether that knowledge be destroyed by disease assuming the form of delusion, or any other form.

It is matter of history that insanity has been for the most part, a growth of the modern state of society. Like many other diseases, it is caused, in a great degree, by the habits and incidents of civilized life. In the earlier and ruder ages, it was comparatively rare. Its present extent has been chiefly attained within a few hundred years. Until recently, there were no asylums for the insane, and no experts devoting their lives exclusively to the practical study and treatment of the disease. The necessary opportunities for obtaining a thorough understanding of it, did not exist until they were furnished by the positions of superintendents of asylums and their assistants. Consequently, until recently, there was very little knowledge of the subject.

In old books it is often found under the head of lunacy. Lord Hale was the first writer who undertook to introduce into a law book any considerable statement of the facts of mental disease. 1 Hale P. C. 29—32. Not only was he guided by the best medical authorities of his day, but he carefully used the language of medical men. Among other current medical ideas which he recorded, was this : the insanity " which is interpolated, and by certain periods and vicissitudes", " is that, which is usually called *lunacy*, for the moon hath a great influence in all diseases of the brain, especially in this kind of *dementia;* such persons commonly in the full and change of the moon especially about the equinoxes and summer solstice, are usually in the height of their distemper " ; and " such persons as have their lucid intervals, (which ordinarily happens between the full and change of the moon) in such intervals, have usually at least a competent use of reason." He did not imagine that this medical lunar theory was a principle of the common law. Lord Erskine, in delivering judgment in *Cranmer's case,* (12 Ves. 445, 451), said, " the moon has no influence " ; and the reporter inserted this marginal note, " In cases of lunacy, the notion, that the moon has an influence, erroneous." The reporter may not have distinguished between law and fact; but Erskine did not suppose that he was announcing his disagreement with Hale on a point of law.

The other causes, symptoms, and tests of mental disease recorded by Hale, were as clear matters of fact as the lunar theory. When he put them in his History of the Pleas of the Crown, he merely followed the line of the custom that had been pursued by him and all other English judges, of giving to the jury, their opinions of the

facts of the cases tried before them. *Ante* 416, 417. In his History of the Common Law, he says of trial by jury, " Another excellency of this trial is this ; that the judge is always present, at the time of the evidence given in it. Herein he is able, in matters of law, emerging upon the evidence, to direct them ; and also, in matters of fact, to give them a great light and assistance, by his weighing the evidence before them, and observing where the question and knot of the business lie ; and by shewing them his opinion even in matter of fact ; which is a great advantage and light to lay-men." 2 Hale's Hist. Com. L. 147.

In *King* v. *Cullender and Duny*, 6 St. Tr. 700, there is an instance of the positive manner in which judges were accustomed to give their opinions to the jury on matters of fact. In that case, the defendants were tried before Hale for witchcraft ; and he instructed the jury as follows : " That there were such creatures as witches he made no doubt at all ; For, first, the scriptures had affirmed so much. Secondly, the wisdom of all nations had provided laws against such persons, which is an argument of their confidence of such a crime." The jury found a verdict of guilty ; the judge was fully satisfied with the verdict ; and, upon his sentence, the defendants were executed. The doctrines of insanity and witchcraft stated by Lord Hale, were held by him in common with the most enlightened classes of the most civilized nations. He was not their author, nor was he responsible for them. They were equally doctrines of fact ; one was no more a matter of law than the other ; and they are equally entitled to oblivion, although the ancient doctrine of insanity outlived the ancient doctrine of witchcraft.

When we remember that the universal belief in witchcraft has been overcome within two hundred years, it is easy to understand how the phenomena of insanity were long regarded as supernatural. Witchcraft and demoniacal possession were accepted as truths taught by miraculous inspiration. Cases of insanity were found, answering the biblical description of cases of demoniacal possession ; but the suggestion that any of the latter might be cases of mental or physical disease, was received as an attack upon the infallibility of the scriptures. This state of things discouraged investigation, and encouraged the belief that insanity, at least in some of its forms, was demoniacal possession. The natural causes and operations of cerebral disease were mysterious ; the theological clouds that encompassed it, were appalling.

In a period of ignorance, credulity, superstition, and religious terrorism, before there was a science of medicine, we should not expect to find any scientific or accurate understanding of such a malady. Well might the boldest shrink from the exploration of a condition believed to be, in its origin, beyond the bounds of nature, and curable only by the power of exorcism.

As the ancient theory of diabolism gradually passed away, insanity was still attributed to special providences, and not to the operation of the general laws of health. The sufferers were treated for wick-

edness rather than sickness. Among men of science, the investigation of the subject is now disencumbered of all theological complications. But this is a modern emancipation not yet realized by the mass of even the most enlightened communities. Very few persons have an adequate conception of the fact that insanity is a disease. The common notion of it, is of something not merely marvellous, but also peculiarly, vaguely, and indescribably connected with a higher or lower world. The insane are generally considered as more than sick; and if they are not spoken of as possessed, their condition, to the popular apprehension, is still enveloped in a supernatural shadow. The Lord Chancellor of England declared, in the House of Lords, on the 11th day of March, 1862, that "the introduction of medical opinions and medical theories into this subject, has proceded upon the vicious principle of considering insanity as a disease." Hansard CLXV, 1297. This remark indicates how slowly legal superstitions are worn out, and how dogmatically the highest legal authorities of this age maintain, as law, tests of insanity, which are medical theories differing from those rejected by the same authorities, only in being the obsolete theories of a progressive science.

It was, for a long time, supposed that men, however insane, if they knew an act ·to be wrong, could refrain from doing it. But whether that supposition is correct or not, is a pure question of fact. The supposition is a supposition of fact,—in other words, a medical supposition,—in other words, a medical theory. Whether it originated in the medical or any other profession, or in the general notions of mankind, is immaterial. It is as medical in its nature, as the opposite theory. The knowledge test in all its forms, and the delusion test, are medical theories introduced in immature stages of science, in the dim light of earlier times, and subsequently, upon more extensive observations and more critical examinations, repudiated by the medical profession. But legal tribunals have claimed those tests as immutable principles of law, and have fancied they were abundantly vindicated by a sweeping denunciation of medical theories,—unconcious that this aggressive defence was an irresistible assault upon their own position.

When the authorities of the common law began to deal with insanity, they adopted the prevailing medical theories. The distinction between the duty of the court to decide questions of law, and the duty of the jury to decide questions of fact, was not appreciated and observed as it now is in this state. In criminal cases, the jury might decide the law as well as the fact (*Pierce* v. *The State*, 13 N. H. 536; Quincy Mass. Reports 558–572); in civil and criminal cases, the court gave to the jury their opinion of the facts as well as of the law (*ante* 416, 417), and the difference between a question of fact and a question of law was generally of little or no practical importancee. When new trials had not come into use (3 Bl. Com. 405; *Witham* v. *Lewis*, 1 Wills. 55, Quincy Mass. Reports 558; Hilliard on New Trials ch. 1, § § 2, 3); when prisoners were not allowed

the asistance of counsel in relation to matters of fact (4 Bl. Com. 355 ; 11 St. Tr. 476 ; 19 St. Tr. 944) ; and juries were punished at the discretion of the court, for finding their verdict contrary to the direction of the judge (4 Bl. Com. 361) ; the sphere of the court was latitudinarian. The judicial practice of directing or advising juries in matters of fact, has never been discontinued in England. And this practice has carried into reports and treatises, on various branches of the law, many opinions of mere matters of fact. Without any conspicuous or material partition between law and fact, without a plain demarcation between a circumscribed province of the court and an independent province of the jury, the judges gave to juries, on questions of insanity, the best opinions which the times afforded. In this manner, opinions purely medical and pathological in their character, relating entirely to questions of fact, and full of error as medical experts now testify, passed into books of law, and acquired the force of judicial decisions. Defective medical theories usurped the position of common-law principles.

The usurpation, when detected, should cease. The manifest imposture of an extinct medical theory pretending to be legal authority, cannot appeal for support to our reason or even to our sympathy. The proverbial reverence for precedent, does not readily yield ; but when it comes to be understood that a precedent is medicine and not law, the reverence in which it is held, will, in the course of time, subside.

The legal profession, in profound ignorance of mental disease, have assailed the superintendents of asylums who knew all that was known on the subject, and to whom the world owes an incalculable debt, as visionary theorists and sentimental philosophers attempting to overturn settled principles of law ; whereas, in fact, the legal profession were invading the province of medicine, and attempting to install old exploded medical theories in the place of facts established in the progress of scientific knowledge. The invading party will escape from a false position when it withdraws into its own territory ; and the administration of justice will avoid discredit when the controversy is thus brought to an end. Whether the old or the new medical theories are correct, is a question of fact for the jury ; it is not the business of the court to know whether any of them are correct. The law does not change with every advance of science ; nor does it maintain a fantastic consistency by adhering to medical mistakes which science has corrected. The legal principle however much it may formerly have been obscured by pathological darkness and confusion of law and fact, is, that a product of mental disease is not a contract, a will, or a crime. It is often difficult to ascertain whether an individual had a mental disease, and whether an act was the product of that disease ; but these difficulties arise from the nature of the facts to be investigated, and not from the law ; they are practical difficulties to be solved by the jury, and not legal difficulties for the court.

If our precedents practically established old medical theories

which science has rejected, and absolutely rejected those which
science has established, they might at least claim the merit of formal
consistency.   But the precedents require the jury to be instructed in
the new medical theories by experts, and in the old medical theories
by the judge.

In *Queen* v. *Oxford*, tried in 1840, Dr. Chowne testified that he
considered doing an act without a motive, a proof, to some extent,
of an unsound mind; that one kind of insanity has been well
described by the term "lesion of the will"; that it is sometimes
called moral insanity; that patients are often impelled to commit
suicide without any motive; that this state of mind is not incom-
patible with an acuteness of mind and an ability to attend to the
ordinary affairs of life.   Ann. Reg. 1840, Part 2, p. 262.   Lord
Denman instructed the jury that if some controlling disease was, in
truth, the acting power within the defendant, which he could not
resist, he was not responsible, and that knowledge was the test.
9 C. & P. 545, 546.

In *Queen* v. *M'Naughten* tried in 1843, Dr. Monro testified that
an insane person may commit murder and yet be aware of the con-
sequences; that lunatics often manifest a high degree of cleverness
and ingenuity, and exhibit occasionally great cunning in escaping
from the consequences of such acts; that he considered a person
laboring under a morbid delusion, to be of unsound mind; that in-
sanity may exist without any morbid delusion; that a person may be
of unsound mind, and yet be able to manage the usual affairs of
life; that insanity may exist with a moral perception of right and
wrong, and that this is very common.   Eight experts gave their
opinions going to show that the defendant had committed the act in
question under the influence of a morbid delusion which deprived
him of the power of self-control.   Their testimony, in substance,
was, that the defendant was insane; and that knowledge of right
and wrong was not the test.   The medical testimony was so strong
that the court stopped the trial, and substantially directed the jury
to acquit the defendant, but Ch. J. Tindal instructed the jury
that knowledge was the test.   It does not appear how the defendant
could be acquitted by that test.   Ann. Reg. 1843, part 2, pp. 35,
359.

In *Queen* v. *Pate*, tried in 1850, Dr. Conolly testified, "I have
conversed with the prisoner since this transaction, and, in my opin-
ion, he is a person of unsound mind.   I am not aware that he
suffers from any particular delusion.   He is well aware that he has
done wrong and regrets it."   Dr. Monro testified, "I have had five
interviews with Mr. Pate since this transaction, and, from my own
observation, I believe him to be of unsound mind.   I agree with Dr.
Conolly that he is not laboring under any specific delusion.   I think
he may have known very well what he was doing, and have known
that it was very wrong; but it frequently happens with persons of
diseased mind that they will perversely do what they know to be
wrong."   Mr. Baron Alderson instructed the jury that knowledge
was the test.

In *Queen* v. *Townley*, tried in 1863, Dr. Winslow testified, "I think that at this present moment he is a man of deranged intellect. He was deranged on the 18th of November, and I thought still more so last night when I saw him the second time." The witness was asked, "If the present state of mental derangement existed on the 21st of August, would it be likely to lead to the commission of the act then committed?" His answer was, "Most undoubtedly. Assuming him to have been on the 21st of August as he was on the 18th of November and yesterday, I do not believe that he was in a condition of mind to estimate, like a sane man, the nature of his act and his legal liability." The witness further testified, "He does not appear to have a sane opinion on a moral point. I have no doubt he knows that these opinions of his are contrary to those generally entertained, and that if acted upon, they would subject him to punishment. I should think he would know that killing a person, was contrary to law, and wrong in that sense. I should think that, from his saying he should be hanged, he knew he had done wrong." Dr. Gisborne testified, "that the prisoner's language implied that he knew that what he had done was punishable, but that he (the witness) believed he would repeat the offence to-morrow." Mr. Baron Martin instructed the jury that knowledge was the test.

In these cases, the testimony of the experts negatived the idea that knowledge of right and wrong is the test. And the admission of this evidence coupled with the rule given by the court to the jury that knowledge is the test, brought the law into conflict with itself. Either the experts testified on a question of law, or the court testified on a question of fact. The conflict was only rendered a little more palpable in *People* v. *Huntington* tried in New York in 1856. Experts testified, as they have long testified in England and elsewhere, that a man without delusion may be irresponsible by reason of insanity, for an act which he knows to be a crime the consequences of which he understands. One expert testified that he defined insanity as a disease of the brain by which the freedom of the will is impaired, and that almost all insane people know right from wrong. The knowledge test of insanity, as laid down by the English judges in their opinions given to the House of Lords in what is called M'Naughten's case, (1 C. & K. 131,) was read by counsel to the experts; the experts were directly asked their opinion of that test, and they testified that they did not agree with the English judges on that subject. The same knowledge test, as laid down by the Supreme Court of New York (*Freeman* v. *People*, 4 Denio 28), was read to one of the experts, and the same kind of testimony was repeated. The court instructed the jury that knowledge was the test. Report of the Trial of *People* v. *Huntington*, 257, 260, 261, 263, 268, 269, 270, 271, 447.

In *Com.* v. *Rogers*, one expert testified that insane persons generally know the distinction between right and wrong. The opinion of three experts was, that the defendant was insane; that his reason had been overborne by delusion, and an insane and irresistible impulse or paroxysm. In coming to that conclusion, it does not appear that

they were guided by the knowledge test; and, upon their testimony, it would seem, that, in their opinion, knowledge was not the test. The court instructed the jury that knowledge was the test. In the application of that test to the evidence, the court adopted the language of the experts in relation to delusion and impulse, intending apparently to use delusion and impulse, not as a substitute for the knowledge test, or as a modification of it, but as an illustration of a process by which the knowledge of the wrongfulness of the act might be suddenly 1 ....oved. The jury were unable to understand the law in the form in which it was stated in the instructions, and, after considering the question of sanity some time, they came into court, and asked what degree of insanity would amount to a justification; but the court added nothing to the instructions previously given. Report of the Trial of *Com.* v. *Rogers*, 149–166, 276–278, 281; S. C. 7 Met. 500.

It is the common practice for experts, under the oath of a witness, to inform the jury, in substance, that knowledge is not the test, and for the judge, not under the oath of a witness, to inform the jury that knowledge is the test. And the situation is still more impressive, when the judge is forced by an impulse of humanity, as he often is, to substantially advise the jury to acquit the accused on the testimony of the experts, in violation of the test asserted by himself. The predicament is one which cannot be prolonged after it is realized. If the tests of insanity are matters of law, the practice of allowing experts to testify what they are, should be discontinued; if they are matters of fact, the judge should no longer testify without being sworn as a witness and showing himself qualified to testify as an expert.

To say that the expert testifies to the tests of mental disease as a fact, and the judge declares the test of criminal responsibility as a rule of law, is only to state the dilemma in another form. For, if the alleged act of a defendant, was the act of his mental disease, it was not, in law, his act, and he is no more responsible for it than he would be if it had been the act of his involuntary intoxication, or of another person using the defendant's hand against his utmost resistance; if the defendant's knowledge is the test of responsibility in one of these cases, it is the test in all of them. If he does know the act to be wrong, he is equally irresponsible whether his will is overcome, and his hand used, by the irresistible power of his own mental disease, or by the irresistible power of another person. When disease is the propelling, uncontrollable power, the man is as innocent as the weapon,—the mental and moral elements are as guiltless as the material. If his mental, moral, and bodily strength is subjugated and pressed to an involuntary service, it is immaterial whether it is done by his disease, or by another man, or a brute or any physical force of art or nature set in operation without any fault on his part. If a man knowing the difference between right and wrong, but deprived, by either of those agencies, of the power to choose between them, is punished, he is punished for his inability to make the choice—he is punished for incapacity; and that is the

very thing for which the law says he shall not be punished. He might as well be punished for an incapacity to distinguish right from wrong, as for an incapacity to resist a mental disease which forces upon him its choice of the wrong. Whether it is a possible condition in nature, for a man knowing the wrongfulness of an act, to be rendered, by mental disease, incapable of choosing not to do it and of not doing it,—and whether a defendant, in a particular instance, has been thus incapacitated,—are obviously questions of fact. But, whether they are questions of fact or of law, when an expert testifies that there may be such a condition, and that, upon personal examination, he thinks the defendant is, or was, in such a condition—that his disease has overcome, or suspended, or temporarily or permanently obliterated his capacity of choosing between a known right and a known wrong,—and the judge says that knowledge is the test of capacity, the judge flatly contradicts the expert. Either the expert testifies to law, or the judge testifies to fact. From this dilemma, the authorities afford no escape.

The whole difficulty is, that courts have undertaken to declare that to be law which is a matter of fact. The principles of the law were maintained at the trial of the present case, when, experts having testified as usual that neither knowledge nor delusion is the test, the court instructed the jury that all tests of mental disease are purely matters of fact, and that if the homicide was the offspring or product of mental disease in the defendant, he was not guilty by reason of insanity.

IV. There was error in the refusal of the court to instruct the jury that there is no legal presumption of sanity; and also in the instruction that every person of mature age is presumed to be sane until there is evidence tending to show insanity.

Malice was alleged in the indictment, and that allegation, as well as every other material averment of the indictment, was traversed by the general issue. On the question of malice, the state had the affirmative and the burden of proof; and the state was required to prove the allegation of malice as well as every other material averment, beyond all reasonable doubt. Sanity being an essential element of malice, must be proved by the state beyond all reasonable doubt. This rule is not peculiar to cases in which malice is formally alleged. Sanity is an indispensable ingredient of all crime. If the crime is denied, sanity is denied, and the party alleging it, must prove it. *State* v. *Bartlett*, 43 N. H. 224. It was held in that case, that the presumptions of sanity and of malice, are presumptions of fact that do not change the burden of proof, but merely authorize the jury to find sanity and malice without any direct testimony of witnesses upon those points. The instruction given in this case, is a departure from *State* v. *Bartlett*; for when the jury were told that every person of mature age is presumed to be sane, they would naturally understand that they received a legal presumption from the court, and not that the presumption was one of fact for them to pass upon. The presumption was laid down with this important qualification,

that it existed only so long as there was no evidence of insanity, and
vanished at the moment the slightest particle of evidence appeared
tending to show insanity. Such a legal presumption would be
irregular, exceptional and anomalous. If there was a legal presump-
tion of sanity, it operated throughout the trial, to keep the burden
of proving insanity, on the defendant, or to support the burden
which belonged to the state. If it did not establish sanity beyond
reasonable doubt, it was immaterial. If it did establish sanity
beyond reasonable doubt, it shifted the burden of proof contrary to
the doctrine of *State* v. *Bartlett.*

Shifting the burden of proof upon the defendant, and allowing him
to throw it back upon the state by a scintilla of testimony, would
naturally be followed by allowing the state to throw it back again
upon the defendant by another scintilla, and so on through an
interminable subdivision of the evidence.

There is no legal guilt in a homicide solely caused by a mental
disease. Mental capacity to commit an offence, includes sanity.
And if there is a legal presumption of innocence, as the books say,
how is it overpowered, in the absence of all evidence, by a legal
presumption of sanity? When the two presumptions come in conflict,
without assistance, how does the law ascertain which prevails?
*Greensborough* v. *Underhill*, 12 Vt. 604; 1 Gr. Ev. § 35. If it is
necessary to abolish one of the presumptions to avoid their conflict,
the presumption of innocence can well be spared, for it is entirely
useless. The state, alleging guilt, must prove it. The burden of
proof is attached to the affirmative. The accused does not need a
presumption of innocence, and it is of no advantage to him. There
is no legal presumption of guilt, and the defendant is as well pro-
tected by the rule which puts the burden of proof on the party
alleging an affirmative, as he would be by a presumption of innocence.
Greenleaf, indeed, says that the legal presumption of innocence is
to be regarded by the jury as matter of evidence. 1 Gr. Ev. § 34.
But this is an incorrect view. A legal presumption is not evidence;
it establishes a point when there is no testimony and no inference
of fact from the absence of testimony, and also when all the
testimony is so balanced that the point is not decided by the tes-
timony. Putting upon the state the burden of proving guilt, and
giving to the defendant a presumption of innocence as evidence
tending to disprove the guilt which the state must prove, would be
like doubling the weight of any testimony the defendant might
introduce, and weighing it once against the state and again in favor
of the defendant. The burden of proof affixed to the affirmative,
generally renders a legal presumption of law unnecessary; but it
seems sometimes to be supposed that there is a necessity for such a
presumption for, or against, every fact alleged and denied in plead-
ing; and more so-called legal presumptions have been constructed
than can be conveniently used.

There are certain natural or usual causes, effects, conditions, and
customs, generally within the reach of the experience or the observa-

tion or the reason of men, which a jury are justified in finding by an inference or presumption of fact when there is no testimony showing an exceptional instance in the case on trial. *Rex* v. *Burdett*, 4 B. & Ald. 121; *Rex* v. *Rosser*, 7 C. & P. 648; *Ottawa* v. *Graham*, 28 Ill. 73. When it is proved that one man has killed another with a deadly weapon, under some circumstances there may be, as a matter of fact, a fair inference of malice and intent to kill; but, in England, and generally in this country, such inferences have been improperly changed into legal presumptions, and used to change the burden of proof throughout the trial. (*ante* p. 431). It is not necessary, in this climate, to offer testimony to show that the ground was frozen the last January, or that it was not frozen the last August. Seedling fruit trees do not generally bear fruit of the best quality; and without any testimony of witnesses as to the product of a particular seedling, a jury would be authorized to presume the fact. In such cases, the absence of testimony tending to show an exception, may be satisfactory evidence tending to show the operation of the known general rule. The inference drawn by the jury from the absence of particular testimony, is a presumption of fact. But many such presumptions have been unnecessarily promulgated by the court, and improperly called presumptions of law,—the court having a great advantage of position in encroaching upon the province of the jury.

The presumption of sanity is not an artificial or legal presumption, but a natural inference of fact to be made by a jury from the absence of evidence to show that a party did not enjoy that soundness which experience proves to be the general condition of the human mind. *Sutton* v. *Sadler*, 3 Com. B. (N. S.) 87, 96. The state has no more need of a legal presumption of sanity, than the defendant has of a presumption of innocence.